OPINION OF THE COURT
Eve Preminger, S.
The petitioners in this adoption proceeding are two women: *845 Valerie C., the biological mother of a six-year-old boy, and her life partner, Diane F. They have raised the boy together since his birth and now seek legal recognition of their mutual status as parents. This appears to be the first such application in New York.
Because of the significant issues of first impression and the importance to the infant, the court appointed Professor Sylvia Law, distinguished Professor of Family Law and Social Policy at New York University Law School, as guardian ad litem for the child. Professor Law was asked to investigate whether the proposed adoption is in the child’s best interest. Her thoughtful and thorough report found that it was and recommends that the court grant the petition.
A home study by a licensed social worker retained by the petitioners also found the adoption to be in the best interest of the child. The court appointed a second licensed social worker to conduct an independent investigation. She agreed that the proposed adoption was in the boy’s best interest.
The reports of Professor Law and the two social workers reveal the following facts:
The petitioners, Diane F. and Valerie C., have lived together in a committed, long-term relationship, which they perceive as permanent, for the past 14 years. Diane, age 39, is an assistant professor of pediatrics and an attending physician at a respected teaching hospital. Valerie, age 40, holds a Ph D. in developmental psychology and teaches at a highly regarded private school.
In 1985 Diane and Valerie decided to have a child together. Pursuant to their joint plan, Valerie was artificially inseminated with sperm obtained from a friend who formally relinquished any claim he might otherwise have had in relation to the child.
Evan was born in November of 1985 and has lived with the parties since his birth. Both home studies describe Diane as a warm, loving and nurturing woman who is committed to Evan and is an effective parent to him. Evan himself is evaluated as a bright, confident and independent young boy with a strong parental bond with both women. He "seems to accept the fact that he has two mothers and seems to have an equal bond with both” and is a "charming, well nourished and articulate child who relates well to peers and adults”. He has a strong parental relationship with Diane, whom he calls Mama D. and an equal relationship with his biological mother, Valerie, whom he refers to as Mama V.
*846 It seems clear that the proposed adoption is in Evan’s best interest. He is part of a family unit that has been functioning successfully for the past six years. The adoption would bring no change or trauma to his daily life; it would serve only to provide him with important legal rights which he does not presently possess. It would afford him additional economic security because Diane would become legally obligated to support him (Domestic Relations Law §§236, 240). He would also be entitled to inherit from Diane and her family under the law of intestate succession (EPTL 2-1.3, 4-1.1) and be eligible for Social Security benefits in the event of her disability or death (42 USC § 402 [d]). Of immediate practical import, he would be able to participate in the medical and educational benefits provided by her employment, which are more generous than those possessed by Valerie.
There is another potential benefit to Evan if he is adopted by Diane. Although today Evan enjoys the devotion and support of two parents who love him and each other, in the event of their separation, it would be beneficial for Evan to retain his filial ties to Diane. In such event, it is known to be better for a child to continue its relationship with both parents, and the law recognizes this by "presuming] that parental visitation is in the best interest of the child, absent proof that such visitation would be harmful” (Matter of Wise v Del Toro, 122 AD2d 714 [1st Dept 1986]; see also, Resnick v Zoldan, 134 AD2d 246 [2d Dept 1987]; Bubbins v Bubbins, 114 AD2d 346 [2d Dept 1985]). Yet if petitioners were to separate in the absence of adoption, under the law of New York (Matter of Alison D. v Virginia M., 77 NY2d 651 [1991]) and some other jurisdictions (Matter of Z.J.H., 162 Wis 2d 1002, 471 NW2d 202 [1991]; Nancy S. v Michele G., 228 Cal App 3d 831, 279 Cal Rptr 212 [1991]) Diane would have no right to visitation even if it were demonstrated that denying visitation would be harmful to Evan. In Alison D. (supra), the Court of Appeals recognized that adoption would avoid this unfortunate result (see, 77 NY2d, at 656). The California court in Nancy S. (supra) recommended adoption as a solution, noting that "[w]e see nothing in [our statutory] provisions [similar to those in New York] that would preclude a child from being jointly adopted by someone of the same sex as the natural parent”. (228 Cal App 3d, at 841, n 8, 279 Cal Rptr, at 219, n 8.)
Even if, as anticipated, the petitioners remain together, there is a significant emotional benefit to Evan from adoption *847 which is perhaps even more crucial than the financial. Separate or together, the adoption brings Evan the additional security conferred by formal recognition in an organized society. As he matures, his connection with two involved, loving parents will not be a relationship seen as outside the law, but one sustained by the ongoing, legal recognition of an approved, court-ordered adoption.
Having determined that adoption would, for all the above reasons, be in Evan’s best interests, the issue remains whether there is anything in the law of this State which would prohibit it. The court has scrutinized the relevant statutes and finds no obstacle.
Under New York law, "[a]n adult unmarried person or an adult husband and his adult wife together may adopt another person” (Domestic Relations Law § 110). As an unmarried adult, Diane is thus qualified to adopt. While the second phrase — requiring that husband and wife jointly agree to adopt a child — is not literally applicable here, the underlying policy also supports adoption in this case. The petitioners are a committed, time-tested life partnership. For Evan, they are a marital relationship at its nurturing supportive best and they seek second-parent adoption for the same reasons of stability and recognition as any couple might.
No provision of New York law requires that the adoptive parent be of any particular gender. Indeed, New York specifically prohibits discrimination against homosexuality in granting adoption (18 NYCRR 421.16 [h] [2]).
New York law does require the consent of certain parties to an adoption. All of the consent requirements have been met in the instant case. Ordinarily a child over the age of 14 must consent to be adopted (Domestic Relations Law § 111 [1] [a]), but Evan is only six. The biological mother must consent (Domestic Relations Law § 111 [1] [c]), and is one of the petitioners in this case. The biological father must consent if he has maintained "substantial and continuous or repeated contact with the child”. (Domestic Relations Law § 111 [1] [d], [e].) Here the biological father has not met the standards that entitle him to object to adoption, and, in any event, he has explicitly waived any right to do so.
The only statutory provision which could be construed as impeding the instant adoption is Domestic Relations Law § 117 (1), which provides that "the natural parents of the adoptive child shall be relieved of all parental duties toward *848 and of all responsibilities for and shall have no rights over such adoptive child”. If this provision were strictly enforced it would require termination of the parental rights of Valerie upon granting the adoption to Diane. This would be an absurd outcome which would nullify the advantage sought by the proposed adoption: the creation of a legal family unit identical to the actual family setup. The Court of Appeals has recognized, in another context, that "[sjection 117 itself does not pretend to discourage all contacts between an adoptive child and its natural relatives. Rather, the statute contemplates that such contacts may exist and that the natural relatives may desire to perpetuate the sense of family * * * An adopted child may not * * * be isolated from Ms or her natural family.” (People ex rel. Sibley v Sheppard, 54 NY2d 320, 325, 326 [1981].) Thus, particularly in situations in which the adoptive and biological relatives are known to one another and where the child has significant contacts with them, New York recognizes the value of continued relationship.
For example, in Matter of A.J.J. (108 Misc 2d 657 [Sur Ct, NY County 1981]), the natural father of a child born out of wedlock sought to adopt the cMld with the mother’s consent. The court granted the adoption and allowed the mother to retain her parental rights, stating that "the child should not be denied the privilege of legitimacy as well as the care and concern of Ms natural mother’s property and her rights of intestacy merely because these adult natural parents refused to marry * * * [and] contravene New York’s policy of fostering the child’s best interests above all else.” (Supra, at 659.) The court exercised its equitable power to confer back to the consenting mother joint custodial rights and responsibilities in the child (supra, at 660; but see, Matter of Hope, 150 Misc 2d 319 [Fam Ct, Westchester County 1991]).
See also, Matter of Anthony (113 Misc 2d 26, 32 [Fam Ct, Bronx County 1982]) where the court found that contact and visitation with the siblings was "necessary to promote [the child’s] best interests”.
TMs court has heretofore declined to apply the cut-off provisions of Domestic Relations Law § 117 when special circumstances exist. In Matter of Roana Beth N. (78 Misc 2d 105 [Sur Ct, NY County 1974]), Surrogate Midonick found that the best interests of the cMld would be served by allowing the new stepfather to adopt, and, at the same time, ordered substantial visitation for the biological father. The court said, " ' "|I]f affection and regard remains between members of a *849 natural family, the law should not in the name of consistency undertake to thwart the expression of those feelings when the encouragement thereof does not hinder the adoptive relationships” ’ ” (78 Misc 2d, at 110, quoting Matter of Scranton v Hutter, 40 AD2d 296, 299).
Thus where the adoptive and biological parents are in fact coparents such as the instant case, New York law does not require a destructive choice between the two parents. Allowing continuation of the rights of both the natural and adoptive parent where compelled by the best interests of the child is the only rational result and well within the equitable power of this court (see, Matter of A.J.J., supra, at 660).
Other jurisdictions have taken a similar approach to cut-off provisions. In Matter of L.S. (DC Super Ct, Fam Div, Nos. A-269-90, A-270-90, Aug. 30, 1991, 17 Fam L Rptr [BNA] 1523 [Sept. 17, 1991]) the District of Columbia granted adoptions to two lesbian parents in a long-term committed relationship, who sought to adopt each other’s biological child. After finding that adoptions would serve the children’s best interests, the court considered the effect of a statute providing that upon adoption, “All rights and duties including those of inheritance and succession between the adoptee, his natural parents, their issue, collateral relatives, and so forth, are cut off” (DC Code § 16-312 [a]). The court concluded that this should be read as directory rather than mandatory, citing the principle of statutory construction that “where no apparent actual or potential injury results to anyone from a failure to adhere to the provisions of a statute, a directory construction usually prevails in the absence of facts indicating that a mandatory construction was intended” (2A Sutherland, Statutory Construction § 57.03, at 644 [Singer — 4th ed 1984]). The court observed that there, as here, to require a choice between the biological and adoptive parent “would be a particularly counterproductive and even ludicrous result, given the purpose underlying the filing of the petition and the court’s finding that the petitioned adoptions would be in the best interests of each child. * * * [The provision] is obviously not intended to apply to the situation presented by these cases * * * at bottom adoption cases are decided by application of the best interests of the child standard, and whenever possible other considerations give way to that standard” if there is a conflict. (17 Fam L Rptr, at 1523-1524.)
In another similar case, In re R.C. (Vt P Ct, Addison County, No. 9088, Dec. 9, 1991) a Vermont court also rejected *850 a literal application of its cut-off provision, approving the statement that "it would be unfortunate if the court were compelled to conclude that adoptions so clearly in the best interests of the [child] could not be granted because of a literal reading of a statutory provision obviously not intended to apply to the situation presented * * * This is particularly so where no party to these proceedings objects to the adoptions” (In re R.C., citing Matter of L.S., supra).
The fact that the petitioners here maintain an open lesbian relationship is not a reason to deny adoption.[1] New York law recognizes that a child’s best interest is not predicated or controlled by parental sexual orientation. The law explicitly *851 provides that agencies evaluating people who seek to adopt shall not reject applicants "solely on the basis of homosexuality.” Rather decisions shall be made in relation to the best interests of adoptive children (18 NYCRR 421.16 [h] [2]). This is consistent with the more general principle that a parent’s sexual orientation or sexual practices are presumptively irrelevant in resolving custody disputes and may be considered "only if they are shown to adversely affect the child’s welfare” (Guinan v Guinan, 102 AD2d 963, 964 [3d Dept 1984]). Consideration of sexual orientation or life-style of a parent "must be limited to its present or reasonably predictable effect upon the children’s welfare” (Di Stefano v Di Stefano, 60 AD2d 976, 977 [4th Dept 1978]).
It is thus apparent that nothing in New York law prevents the granting of this adoption.[2] Other jurisdictions have reached similar results. While there have been no appellate decisions, several trial courts have approved adoptions recognizing both partners in a lesbian couple as the legal parents of the children they are jointly raising. In some cases the nonbiological mother has been permitted to adopt the child born to her lesbian partner, without terminating the parental rights of the biological mother. (Matter of L.S., supra; Matter of Nancy M., Cal Super Ct, San Francisco County, No. 18744 [1990]; In re Child No. 1, Wash Super Ct, Thurston County, No. 89-5-0067-7 [Nov. 16, 1989]; In re E.B.G., Wash Super Ct, Thurston County, No. 87-5-00137-5 [Mar. 29, 1989]; Matter of Carol, Cal Super Ct, San Francisco County, No. 18573 [1989]; Matter of Achtenberg, Cal Super Ct, San Francisco County, No. AD 18490 [1989]; In re Minor Child, Alaska Super Ct, Juneau County, No. lJu-86-73 P/A [Feb. 6,1987]; In re A.O.L., Alaska Super Ct, Juneau County, No. 154-85-25 P/A [1985].) Adoptions have been granted with the approval of the State agency or the guardian ad litem (Matter of L.S., supra; Matter of Nancy L., Cal Super Ct, San Francisco County, No. 17945 [1986]; In re Minor Child, supra) and over their objection (In re E.B.G., supra; Matter of Nancy M., supra). Lesbian couples have also been permitted to jointly adopt the children they are raising in cases where neither is the biological mother (Matter of Anne, Cal Super Ct, Alameda County, No. 17350 [1986]; Matter of Nancy L., supra).
*852 Finally, this is not a matter which arises in a vacuum. Social fragmentation and the myriad configurations of modern families have presented us with new problems and complexities that cannot be solved by idealizing the past. Today a child who receives proper nutrition, adequate schooling and supportive sustaining shelter is among the fortunate, whatever the source. A child who also receives the love and nurture of even a single parent can be counted among the blessed. Here this court finds a child who has all of the above benefits and two adults dedicated to his welfare, secure in their loving partnership, and determined to raise him to the very best of their considerable abilities. There is no reason in law, logic or social philosophy to obstruct such a favorable situation.
Petition granted.

. Concern that a child would be disadvantaged by growing up in a single sex household is not borne out by the professional literature examined by this court. See, e.g., the recent study by Dr. Charlotte J. Patterson of the University of Virginia entitled Children of Lesbian and Gay Parents (1991). While the actual number of children being raised in households with a homosexual parent is unknown (Polikoff, This Child Does Have Two Mothers: Redefining Parenthood to Meet the Needs of Children in Lesbian-Mother and Other Nontraditional Families, 78 Geo LJ 459, 461, n 2 [1990]), estimates range from 6 million (Schulenberg, Gay Parenting [1985]) to 8 to 10 million (ABA Annual Meeting Provides Forum for Family Law Experts, 13 Fam L Rptr [BNA] 1512, 1513 [Aug. 25, 1987]). Dr. Patterson reports that research that has been done in recent years on the possible differences between children of gay and lesbian parents and children of heterosexual parents in otherwise comparable circumstances reveals no disadvantages among the former in any significant respect. (See, e.g., Golombok, Spencer & Rutter, Children in Lesbian and Single Parent Households: Psychosexual and Psychiatric Appraisal, 24 J of Child Psychology & Psychiatry, at 551-572 [1983]; Gottman, Children of Gay and Lesbian Parents, reprinted in Bozett and Sussman, Homosexuality and Family Relations, at 177-196 [1990]; Green, Sexual Identity of 37 Children Raised by Homosexual or Transsexual Parents, 135 Am J of Psychiatry, at 692-697; Green, Mandel, Hotvedt, Gray & Smith, Lesbian Mothers and Their Children: A Comparison with Solo Parent Heterosexual Mothers and Their Children, 15 Archives of Sexual Behavior, at 167-184 [1986]; Hoeffer, Children’s Acquisition of Sex-Role Behavior in Lesbian-Mother Families, 5 Am J of Orthopsychiatry, at 536-544 [1981]; Huggins, A Comparative Study of Self-Esteem of Adolescent Children of Divorced Lesbian Mothers and Divorced Heterosexual Mothers, reprinted in Bozett, Homosexuality and the Family, at 123-135 [1989]; Kirkpatrick, Smith & Roy, Lesbian Mothers and Their Children: A Comparative Survey, 5 Am J of Orthopsychiatry, at 545-551 [1981]; Miller, Gay Fathers and Their Children, 28 Fam Coordinator, at 544-552 [1979]; Paul, Growing up with a Gay, Lesbian, or Bisexual Parent: An Exploratory Study of Experiences and Perceptions, unpublished doctoral dissertation, U Cal at Berkeley [1986]; Steckel, Separation-Individuation in Children of Lesbian and Heterosexual Couples, unpublished doctoral dissertation, Wright Inst Graduate School [1985]; Steckel, Psychosocial Development of Children of Lesbian Mothers, reprinted in Bozett, Gay and Lesbian Parents, at 75-85 [1987].)

. Although a few States expressly prohibit homosexual adoption (see, Fla Stat Annot § 63.042 [3]; NH Rev Stat Annot § 170-B:4), the majority do not.