267 N.J. Super. 622 (1993)
632 A.2d 550
IN THE MATTER OF THE ADOPTION OF A CHILD BY J.M.G.
Superior Court of New Jersey, Chancery Division Essex County.
Decided July 28, 1993.
*623 Barbara S. Fox for plaintiff (Harris, Dickson, Buermann, Tanner, Ashenfelter, Slous and Boyd, for attorneys).

OPINION
FREEDMAN, P.J.S.C.,
Plaintiff, J.M.G., is seeking a judgement allowing her to adopt the biological child of her lesbian partner, E.O. This is a case of first impression in the State of New Jersey.
The court appointed a guardian ad litem for the child, Professor Barbara Coles Bolella, Esq., a Professor at the Seton Hall University School of Law, Center for Social Justice. The court requested that the guardian investigate and report on the best interests of the child and, further, take a position as to whether New Jersey statutes or public policy would prohibit this proposed adoption. *624 The court also ordered that the statutorily required report be prepared by an independent investigative organization, Children of the World, and a recommendation be made as to the best interests of the child. This report was completed and made available to the guardian ad litem. In addition, a hearing was held before this court and testimony was taken from both the biological mother and the plaintiff.
The reports prepared by both the guardian ad litem and Children of the World found and recommended quite emphatically that granting this petition for adoption is in the best interests of this child. (Barbara Coles Bolella, Seton Hall Family Law Clinic, Report of Guardian ad litem, December 17, 1992 [hereinafter, Bolella Report]; Veronica Serio, Report of the Investigation of Children of the World, October 26, 1992 [hereinafter, Children of the World Report]). These reports, and the testimony taken in court, revealed information which the court finds by clear and convincing evidence constitutes the facts of this case.
The plaintiff and E.O., the biological mother, have been in a committed relationship for approximately 10 years. Plaintiff is employed part-time by a cable T.V. network and is the primary caretaker of the child. E.O. is an executive vice-president for a large communications company. They jointly own a home and other properties for investment purposes. They have a low six-figure combined income and the extended families of both women are supportive and involved in the life of the child.
Early in their relationship, J.M.G. and E.O. planned to have a child. They agreed that E.O. would give birth and that they would both raise the child as co-equal parents with mutual responsibilities as care-givers. In 1988, E.O. was artificially inseminated, under the supervision of her physician, through an anonymous donor. The child was born on October 3, 1989, and has lived continuously with both J.M.G. and E.O. since her birth.
The report prepared by Veronica Serio, M.A., Executive Director of Children of the World, concluded that the "adjustment of *625 the child and plaintiff to each other is that of mother and child." Children of the World Report, sec. VI. Similarly, the guardian ad litem stated, in part, "[i]t is also quite clear that [the child] is definitively attached to the plaintiff ... [she] moves back and forth between her two mothers with relative ease." Bolella Report at 2. The plaintiff is clearly both physically and financially capable of supporting and nurturing the child. The child was described as "ebullient and good natured," ibid., and as an "attractive, bright, lively, talkative child." Children of the World Report at 1.
This court has determined from its own evaluation, in conjunction with these independent reports, that granting this adoption is in the best interests of this child.
As in the recent New York opinion, In re Adoption of a Child Whose First Name is Evan, 153 Misc.2d 844, 583 N.Y.S.2d 997 (Sur. 1992), the court is convinced that this adoption will cause no change to the child's daily life but will provide critical legal rights and protections for her safety as well as her physical and emotional well-being. This adoption will provide additional economic security. Both the right to support, as per N.J.S.A. 9:3-50(b), and the right to inherit by intestacy from plaintiff and her family will be assured (N.J.S.A. 3B:5-9; 3-50(b)). The child will also be eligible for health insurance as a dependant, and for social security benefits in the event of plaintiff's disability or death. 42 U.S.C.A. § 402(d). This adoption will also protect the continuity of the child's relationship with plaintiff if either some accident or injury befalls the biological parent (E.O.), or if J.M.G. and E.O. separate.
It is well recognized in New Jersey law that "there can be a psychological parent-child relationship between a child and someone other than the child's biological parent." Hoy v. Willis, 165 N.J. Super. 265, 398 A.2d 109 (App.Div. 1978). The courts have recognized the need to protect the child from the emotional trauma which may be caused by terminating such psychological *626 relationships.[1] Particularly in this matter, where the plaintiff is the primary caretaker, the court must consider the psychological importance of this relationship to the child.
The importance of the emotional benefit of formal recognition of the relationship between J.M.G. and the child must not be underestimated. Some courts have allowed the stereotypes and public disapproval from some quarters (which they feel may exist and may negatively impact on the child) to affect their decisions in these matters. "Courts sometimes allow the risk of harassment and stigmatization to be decisive without any evidence proving that harassment has occurred or is likely to occur. Courts should not assume that harassment will occur without supporting evidence. Moreover, they should recognize that community disapproval will not necessarily adversely affect children." Sexual Orientation and the Law 128 (Harvard Law Review eds., 1990). Indeed, if there is ever any harassment or community disapproval, this court should have no role in supporting or tacitly approving such behavior. The court's recognition of this family unit through the adoption can serve as a step in the path towards the respect which strong, loving families of all varieties deserve.
The guardian ad litem concluded, and this court agrees, that there exists no legal barrier to prevent this adoption from proceeding.
I am convinced that E.O. has made a knowing and voluntary consent to this adoption, satisfying N.J.S.A. 9:3-43(a). Since the identity of the father cannot be determined, notice is unnecessary. In fact, N.J.S.A. 9:17-44(b) provides that sperm donors have no legal "rights or duties stemming from the conception of a child." *627 Therefore the court waived the notice requirement under N.J.S.A. 9:3-45(d).
J.M.G. is a qualified adoptive parent. N.J.S.A. 9:3-21, which was specifically repealed, stated in section A that only, "(1) a husband and wife jointly; (2) a husband with his wife's consent; (3) a wife with her husband's consent; or (4) an unmarried person," could institute an action for adoption. The current applicable statute, N.J.S.A. 9:3-43, states in pertinent part, "a. Any person may institute an action for adoption...." This more expansive language is indicative of the statutory imperative that, "this act shall be liberally construed to the end that the best interests of children be promoted." N.J.S.A. 9:3-37.
The statute further permits adoption without the need to terminate E.O.'s parental rights. A stepparent may, with the consent of the biological parent, adopt without affecting or terminating the rights of the consenting parent. N.J.S.A. 9:3-50(a). This statutory provision, as well as the liberally construed term "stepparent," is further indication that the public policy of New Jersey is to protect the best interests of the child above rigid constructions of the term "family." See In re Adoption of a Child by A.R., 152 N.J. Super. 541, 545, 378 A.2d 87 (Cty.Ct. 1977);[2]see also Klipstein v. Zalewski, 230 N.J. Super. 567, 599, 553 A.2d 1384 (Ch.Div. 1988).[3]
A recent decision of the Vermont Supreme Court considered the identical issue of whether a Vermont adoption statute required the termination of the birth mother's rights in the adoption of her *628 child by the mother's lesbian partner. Adoptions of B.L.V.B. and E.L.V.B., 628 A.2d 1271 (Vt. 1993). The statute[4] under consideration by the Vermont court was substantially similar to N.J.S.A. 9:3-50(a), containing, as well, a "stepparent-exception" provision, as so characterized by that court. Adoptions of B.L.V.B. and E.L.V.B., at 1274 (Vt.Sup.Ct. 1993). The Vermont Supreme Court found same-sex adoptions to fall within the "stepparent-exception" of its statute and ruled that, "when the family unit is comprised of the natural mother and her partner, and the adoption is in the best interests of the children, terminating the natural mother's rights is unreasonable and unnecessary". Id. at 1272 (emphasis added).
As in the Vermont case, in this matter it would defeat the purpose of the adoption to cut off the parental rights of the biological mother, and it would be antithetical to the child's best interests. The point of this adoption is to give the child all of the benefits of having both "parents" legally responsible for her well being.
The court feels constrained by the state of the law from proclaiming J.M.G. an actual "stepparent," given the fact that same-sex marriages are not legal in this state. However, I am convinced that in this adoption, J.M.G. should be treated as a stepparent as a matter of common sense, and in order to protect the child's interests in maintaining her relationship with her biological mother.
New Jersey law has recognized in custody matters that the rights of parents cannot be denied, limited, or abridged on the basis of sexual orientation. See In re J.S. & C., 129 N.J. Super. *629 486, 489, 324 A.2d 90 (Ch.Div. 1974). In addition, after a review of the State Adoption Manual of the Division of Youth and Family Services for the State of New Jersey, while there are no written policies, it is apparent the Division, on a case-by-case basis, has supported homosexuals adopting children. The Division is precluded from discriminating against homosexuals under federal law. The Division considers "parenting and role model needs of the child in contrast with the structure and atmosphere of the prospective adoptive home" when evaluating possible adoptive homes.[5] Applying the standard in custody matters, this court can discern no reason to treat sexual orientation as anything more than a factor in its decision. This factor is only dispositive if it is proven that it adversely affects the child.
Courts have, in various jurisdictions, denied both custody and adoption to homosexuals based on preconceptions not based in fact. See Shaista-Parveen Ali, Comment, Homosexual Parenting: Child Custody and Adoption, 22 U.C. Davis L.Rev. 1009, 1013 (1989). Although studies on the subject of homosexual parents have been limited, they have shown that, "overall then, development of gender identity, of gender role behavior, and sexual preference among offspring of gay and lesbian parents was found in every study to fall within normal bounds ... no evidence has been found for significant disturbances of any kind in the development of sexual identity among these individuals." Charlotte J. Patterson, Children of Lesbian and Gay Parents, 63 Child Development 1025, 1031-32 (1992); See also, Daniel Goldman, Studies Find No Disadvantage in Growing Up in a Gay Home, N.Y. Times, December 2, 1992, at C14. Although some states still maintain presumptions against granting custody to gay and lesbian parents, only two states, Florida and New Hampshire, statutorily *630 prohibit gay men and lesbians from adopting.[6] At least ten states have explicitly rejected presumptions against awarding custody to gay and lesbian parents. Courts in these states have held that they will not deny custody to a parent on the ground of sexual orientation absent proof that the parent's orientation would adversely affect the child.[7] As was the case in In re Adoption of a Child Whose First Name is Evan, supra, 583 N.Y.S.2d at 997, and in the California case, Nancy S. v. Michele G., 228 Cal. App.3d 831, 279 Cal. Rptr. 212 (Ct.App. 1991), this court finds that there is "nothing in [our] statutory provisions that would preclude a child from being jointly adopted by someone of the same sex as the natural parent." 279 Cal. Rptr. 212, 219 n. 8. The New York case cites a multitude of other cases in other jurisdictions where the non-biological mother has been permitted to adopt the child born to her lesbian partner, without terminating the parental rights of the biological mother. This court does not find it necessary to reiterate those citations here.
This court is fully satisfied that the fact that J.M.G. is the lesbian partner of the biological mother of the child does not adversely affect the child. On the contrary, the child's adjustment has been evaluated as "excellent" and J.M.G. and E.O. are "loving *631 and warm people who are providing the child with a secure environment in which to grow and develop." Children of the World Report at 3-4.
No statute or discernible public policy prevents this court from granting this adoption.[8] New Jersey courts have historically been liberal in their construction and interpretation of the law governing custody and adoptions. Indeed the statute itself mandates that the law be so construed to promote and protect the child's best interests. N.J.S.A. 9:3-37.
This case arises at a time of great change and a time of recognition that, while the families of the past may have seemed simple formations repeated with uniformity (the so called "traditional family") families have always been complex, multifaceted, and often idealized. This court recognizes that families differ in both size and shape within and among the many cultural and socio-economic layers that make up this society. We cannot continue to pretend that there is one formula, one correct pattern that should constitute a family in order to achieve the supportive, loving environment we believe children should inhabit. This court finds that the family before it is providing a secure, stable, and nurturing environment for the child. This is to be commended. *632 J.M.G. is one of the two cornerstones of this supportive home, and beyond all other issues it is upon this factor that this court primarily relies in granting this petition for adoption.
Counsel should submit an appropriate judgment within twenty days.
NOTES
[1] The guardian ad litem also suggested in her evaluation of the applicable statutes that N.J.S.A. 9:6B-1, the "Child Placement Bill of Rights," emphasizes the need to keep the family unit intact and supports the theory that the child has a constitutional associational right to maintain this family unit. While this court takes no position as to this constitutional assertion it is clear that the statute supports the importance of maintaining established family ties which this adoption would protect.
[2] Finding that "the child should not be adversely affected" by the state of the law, the court interpreted the term "stepfather" in N.J.S.A. 9:3-30(a) to include the acknowledged natural father, who was not and could not be married to the natural mother based on her incompetence. The court ruled in this manner to preserve the right and relationship between the child and the mother while allowing the adoption by the father to occur.
[3] The court recognized and did not foreclose the possibility that the term "stepparent" could be applied to a person who lives with, but is not married to, the natural or adoptive parent of a child.
[4] "The natural parents of a minor shall be deprived, by the adoption, of all legal right to control of such minor, and such minor shall be freed from all obligations of obedience and maintenance to them.... Notwithstanding the foregoing provisions of this section, when the adoption is made by a spouse of a natural parent, obligations of obedience to, and rights of inheritance by and through the natural parent who has intermarried with the adopting parent shall not be affected." Vt. Stat. Ann. tit. 15, § 448 (1989).
[5] Vol. M  Casework Policy and Procedures, Division of Youth and Family Services, New Jersey State Department of Human Services, Field Operations Manual II, § 14(31) (1986).
[6] See Fla. Stat. Ann. § 63.042(3) (West 1985); N.H. Rev. Stat. Ann. § 170-B:4 (1988).
[7] See S.N.E. v. R.L.B., 699 P.2d 875, 879 (Alaska 1985); In re Marriage of Birdsall, 197 Cal. App.3d 1024, 1028, 243 Cal. Rptr. 287, 289 (1988); Nadler v. Superior Court, 255 Cal. App.2d 523, 525, 63 Cal. Rptr. 352, 354 (1967); D.H. v. J.H., 418 N.E.2d 286, 293 (Ind. Ct. App. 1981); Doe v. Doe, 16 Mass. App. Ct. 499, 503, 452 N.E.2d 293, 296 (1983); In re J.S. & C., 129 N.J. Super. 486, 489, 324 A.2d 90, 92 (Ch.Div. 1974), aff'd, 142 N.J. Super. 499, 362 A.2d 54 (App.Div. 1976); Guinan v. Guinan, 102 A.D.2d 963, 964, 477 N.Y.S.2d 830, 831 (1984); Stroman v. Williams, 291 S.C. 376, 379-80, 353 S.E.2d 704, 705-06 (Ct.App. 1987); Medeiros v. Medeiros, 8 Fam.L.Rep. (BNA) 2372 (Vt.Super.Ct. 1982); In re Marriage of Cabalquinto, 100 Wash.2d 325, 329, 669 P.2d 886, 888 (1983); Rowsey v. Rowsey, 174 W. Va. 692, 329 S.E.2d 57, 60-61 (1985); See also, In re Jacinta M., 107 N.M. 769, 764 P.2d 1327 (Ct.App. 1988) (dictum) (stating that the homosexuality of the child's brother was not sufficient alone to deny him custody; as cited in Sexual Orientation and the Law, supra, at 121 n. 15).
[8] Indeed, the public policy of New Jersey as reflected in the recently amended N.J.S.A. 10:5-6 seems to indicate that any discrimination based solely on sexual orientation is antithetical to the protection of civil rights. The statute reads in pertinent part as follows:

"[T]here is created in the Department of Law and Public Safety a division known as `the Division on Civil Rights' with power to prevent and eliminate discrimination in the manner prohibited by this act against persons of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation or sex or because of their liability for service in the Armed Forces of the United States, by employers, labor organizations, employment agencies or other persons ..." (emphasis added).