285 N.J. Super. 1 (1995)
666 A.2d 535
IN THE MATTER OF THE ADOPTION OF TWO CHILDREN BY H.N.R.
Superior Court of New Jersey, Appellate Division.
Argued September 12, 1995.
Decided October 27, 1995.
*3 Before Judges PRESSLER, KEEFE and WEFING.
Barbara S. Fox argued the cause for appellant (Harris, Dickson, Buermann, Tanner, Ashenfelter, Slous, Fox & Boyd, attorneys; Ms. Fox, on the brief).
Annamay T. Sheppard and Marsha Wenk submitted a brief on behalf of amicus curiae American Civil Liberties Union of New Jersey.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
The fundamental question raised by this appeal is whether the adoption laws of this State permit the adoption of children by the same-sex cohabiting partner of their natural mother without affecting the mother's parental rights. We disagree with the trial court's negative response to this question and, consequently, reverse the judgment below dismissing plaintiff's adoption complaint. We are, moreover, persuaded that, since the adoption here sought plainly serves the best interests of the children, the judgment of adoption must be granted.
The issue arises in the context of a non-traditional family unit, which, according to the literature, is one of increasing currency.[1] As appears in this record, plaintiff Hannah (a fictitious name) is the committed partner of Mary (a fictitious name). They have been living together for some fourteen years, and both regard their relationship as permanent. Both women are trained radiation therapists. Hannah has further training in oncological radiation and is now employed as the administrative director of the *4 department of radiation oncology in a New Jersey hospital. The two women own a home in a prosperous suburban community which they purchased as joint tenants with right of survivorship. Most of their other assets are in joint ownership as well.
From the outset of their relationship, the women discussed the prospect of having children, and that was their intention. Hannah, the elder, attempted to conceive by anonymous-donor artificial insemination but was unsuccessful. Mary then attempted to conceive in the same fashion and was successful. During Mary's pregnancy, the women agreed that since Hannah's income was the higher, Mary would remain at home as the primary care giver and Hannah would continue to work to support the family. Hannah was much involved with the pregnancy, attending Lamaze classes with Mary, who was delivered of twins, a boy Z. and a girl M., by Caesarean section in August 1992. Hannah was present during the delivery. Since the twins were premature, they required neonatal care, remaining in the hospital for some seven weeks after their birth. Mary and Hannah took turns in attending the children at the hospital.
From the time the twins were brought home, Hannah has been fully involved in their care and nurturing. She was able to take a month of accumulated leave at that time and participated equally with Mary in their first weeks at home. She has since arranged her work schedule so as to enable her arrival home each day by 3:00 or 3:30 p.m., and thus to participate in dinner preparations and the children's late afternoon and bedtime care and activities. According to the report of the Children's Aid and Adoption Society, appointed to make a report and recommendation to the court when the adoption complaint was filed, the children, now three years old, appear equally bonded to both women. They call Hannah "Mom" and Mary "Mommie." Decisions respecting the twins' upbringing are made jointly by the two women. The extended families of both women, who are supportive of their family unit, are much involved in their lives, sharing visits, holidays, and the like. Hannah has taken particular pains to foster a *5 relationship between the twins and her four nephews, two teenagers and two young adults.
The women have given careful consideration to the future. They have set aside a college fund for the twins. They have provided for each other and the children by will. They have discussed the possibility of their future separation, an event neither now believes is remotely likely, and have agreed that should that occur, Mary would remain the primary custodial parent and Hannah would have liberal visitation rights as well as the continued support obligation.
Both women are strongly in favor of Hannah's adoption of the twins. Although neither foresees that a judgment of adoption will effect any fundamental change in the way the family lives, they are both desirous of creating the legal relationship between Hannah and the children in order to confer dependency benefits on the twins, such as coverage under Hannah's employer-provided health insurance, to confer parental rights on Hannah, and, in general, to assure the continuity of the custodial and financial rights and responsibilities characterizing the parental relationship. Mary executed a consent to Hannah's adoption of the children, and, accordingly, Hannah filed this adoption complaint.
The report of the Children's Aid and Adoption Society, admitted into evidence, which is strongly supportive of Hannah's adoption, describes the family members and their functioning as a family in part as follows:
Since their birth, the twins have been under the continuous care and supervision of [Mary] and [Hannah] with [Mary] acting as their primary care giver. This plan was made prior to the children's birth.
The twins have been monitored closely by their physicians since their premature birth ... necessitated their spending the first seven weeks of their life in the neonatal intensive care unit of the hospital....
Z. and M. have had all age appropriate immunizations and are generally healthy. The twins sleep well and have excellent appetites. Each child has a bedroom beautifully decorated in appropriate childhood motifs with M. having a feminine design and Z. a masculine design.
....

*6 [Hannah] and [Mary] have shared in all the joys and trauma of having children.... While the twins were hospitalized one or the other was at their bedside almost constantly. Both women share not only in the children's care but also in their discipline. They themselves were raised in loving supportive families that did not use physical punishment. They agree that techniques such as re-direction and patient explanation are effective for young children and deprivation of privilege most appropriate for older. They heartily disapprove of physical punishment. Although [Hannah] and [Mary] have a long term committed relationship, they have looked to all future possibilities. They not only have provided for the twins in their wills but have also agreed in writing that in the event of their separation, the twins would remain with [Mary] and [Hannah] would have liberal visitation and input into their lives. In the event of an untimely death, they have confidence in each other's ability to raise the twins as a single parent.
[Hannah] and [Mary] plan to be open and honest with the children about the circumstances of their birth and non-traditional family composition. Their plan is to provide the children with information suitable to their ability to understand. More detail is to be furnished as the twins mature. Both parents want the children to have good self esteem and a good sense of gender identity. They will provide the children every opportunity for an excellent education and development of skills and talents.
The consequent recommendation of the Children's Aid and Adoption Society concludes as follows:
[Hannah] is seeking to legally adopt Z. and M.... The children have been in the continuous custody of [Mary] and [Hannah]. These parents provide traditional love, nurture, physical and financial care of their children. This is reflected by the excellent growth and development of both children.
[Hannah] is an intelligent, sensitive person who enjoys all aspects of parenthood. She wants to provide love, security, and an enriching family life for the children.
It would appear from the agency's limited contact with this family that it is in the best interest of Z. and M. to be adopted by [Hannah].
The trial judge denied the adoption on the ground that same-sex partner adoptions are not permitted under the New Jersey adoption statute. We conclude, however, that his reading of the statute was erroneously over-restrictive.
We begin our analysis with the adoption statute itself, noting that N.J.S.A. 9:3-37 requires that the "act be liberally construed to the end that the best interests of children be promoted." That is, of course, our touchstone. We further note that the statute is silent in respect either of joint adoption by unmarried persons or adoption by an unmarried cohabitant of his or her partner's child with the partner's consent. Since the statute does not expressly *7 prohibit such adoptions, the question is whether it should be read as permitting them if they will serve the children's best interests.
We are satisfied that there are only two other relevant statutory provisions whose construction informs that decision. First is N.J.S.A. 9:3-43a, which permits "any person" to institute an action for adoption, provided only that if the person is married, the action be brought either jointly with or with the consent of the person's spouse. Clearly, in this jurisdiction at least, an unmarried person, either heterosexual or homosexual, qualifies. Compare M.P. v. S.P., 169 N.J. Super. 425, 404 A.2d 1256 (App.Div. 1979) (mother's homosexuality does not require loss of post-divorce custody). The second relevant provision is N.J.S.A. 9:3-50, prescribing the legal effects of a judgment of adoption and providing that entry of the judgment absolutely terminates the parental rights of the natural parents unless, to the extent here pertinent, the plaintiff "is a stepfather or stepmother of the adopted child and the adoption is consummated with the consent and approval of the mother or father, respectively."[2]
As we understand the trial judge's reasoning, he was of the view that since the plaintiff was not the legal spouse of the natural mother, she could not qualify as a stepparent and, consequently, her adoption petition could not be granted since it would have the inevitable and unintended effect of terminating the biological mother's parental rights. We are, however, persuaded that that statutory provision, read in context and construed in light of both the liberal-construction mandate and the best-interests test, does not support the trial judge's denial of the petition. In sum, we conclude that the stepparent exception to the natural parent's *8 termination of rights should not be read literally and restrictively where to do so would defeat the best interests of the children and would produce a wholly absurd and untenable result.
That proposition was recognized almost two decades ago by Judge Dreier, then sitting in the former county court. The adoption complaint before him in In re Adoption by A.R., 152 N.J. Super. 541, 378 A.2d 87 (Cty.Ct. 1977), had been brought by the child's natural father who was unable to marry the child's natural mother because of her incompetence.[3] As there was no marriage, the father was not a spouse and, hence, not a stepparent. Judge Dreier concluded that the stepparent exception "must be read against the peculiar factual setting of this case, and with an application of common sense." Id. at 545, 378 A.2d 87. He accordingly allowed the adoption while preserving the natural mother's status despite the plaintiff's failure to meet the literal definition of a stepparent. That proposition has also been recently relied on by Judge Freedman, who allowed a same-sex cohabitant to adopt her partner's natural child as the child's second parent. Matter of Adoption of Child by J.M.G., 267 N.J. Super. 622, 632 A.2d 550 (Ch.Div. 1993). Judge Freedman reasoned, and we agree, that where the mother's same-sex partner has, with the mother's consent, participation and cooperation, assumed a full parental role in the life of the mother's child, and where the child is consequently bonded to the partner in a loving, functional parental relationship, the stepparent provision of N.J.S.A. 9:3-50 should not be narrowly interpreted so as to defeat an adoption that is clearly in the child's best interests.
Our conclusion that the stepparent exception should be broadly construed to enable this adoption to proceed is consistent with the views of other states that have recently considered the precise question before us, raised, moreover, in remarkably congruent *9 factual contexts and involving virtually identical statutes.[4] Thus, Adoption of B.L.V.B., 160 Vt. 368, 628 A.2d 1271 (Sup.Ct. 1993), as here, involved an adoption petition by the same-sex cohabiting partner of the biological mother who had conceived twins by way of artificial insemination. The petitioner, as here, had shared the parenting of the children with their biological mother since their births. In construing the Vermont adoption statute, closely analogous to New Jersey's, the court persuasively reasoned as follows:
When the statute is read as a whole, we see that its general purpose is to clarify and protect the legal rights of the adopted person at the time the adoption is complete, not to proscribe adoptions by certain combinations of individuals.... The statute also terminates the natural parents' rights upon adoption, but this provision anticipates that the adoption of children will remove them from the home of the biological parents, where the biological parents elect or are compelled to terminate their legal obligations to the child.... The legislature recognized that it would be against common sense to terminate the biological parent's rights when that parent will continue to raise and be responsible for the child, albeit in a family unit with a partner who is biologically unrelated to the child.
Although the precise circumstances of these adoptions may not have been contemplated during the initial drafting of the statute, the general intent and spirit of § 448 [analogous to N.J.S.A. 9:3-50] is entirely consistent with them. The intent of the legislature was to protect the security of family units by defining the legal rights and responsibilities of children who find themselves in circumstances that do not include two biological parents. Despite the narrow wording of the step-parent exception, we cannot conclude that the legislature ever meant to terminate the parental rights of a biological parent who intended to continue raising a child with the help of a partner. Such a narrow construction would produce the unreasonable and irrational result of defeating adoptions that are otherwise indisputably in the best interests of children.
Other courts have agreed in allowing the biological mother's same-sex partner to adopt the children as a second parent. See, Adoption of Tammy, 416 Mass. 205, 619 N.E.2d 315 (Sup.Jud.Ct. 1993); In re M.M.D. & B.H.M., 662 A.2d 837 (D.C. Cir.1995); In re Petition of K.M. and D.M., 274 Ill. App.3d 189, 210 Ill.Dec. 693, *10 653 N.E.2d 888 (1995); Matter of S.M.Y., 163 Misc.2d 272, 620 N.Y.S.2d 897 (Fam.Ct. 1994); Matter of Adoption of Caitlin, 163 Misc.2d 999, 622 N.Y.S.2d 835 (Fam.Ct. 1994); Matter of Adoption of Evan, 153 Misc.2d 844, 583 N.Y.S.2d 997 (Surr.Ct. 1992). The only dissenting judicial voices are those of the New York Appellate Division for the Second Department in Matter of Dana, 209 A.D.2d 8, 624 N.Y.S.2d 634 (1995), leave to appeal granted, 85 N.Y.2d 809, 628 N.Y.S.2d 52, 651 N.E.2d 920 (Ct.App. 1995), and the divided Supreme Court of Wisconsin in In Interest of Angel Lace M., 184 Wis.2d 492, 516 N.W.2d 678 (1994) (Chief Justice Heffernan and Justices Abrahamson and Bablitch dissenting), declining broadly to construe the stepparent exception. We concur with the Wisconsin dissent. See also Larsen, Annotation, Adoption of Child by Same-Sex Partners, 27 A.L.R.5th 54 (1995).
We find particularly apt these observations by the Vermont supreme court in B.L.V.B. supra, 628 A.2d at 1275:
When social mores change, governing statutes must be interpreted to allow for those changes in a manner that does not frustrate the purposes behind their enactment. To deny the children of same-sex partners, as a class, the security of a legally recognized relationship with their second parent serves no legitimate state interest.
The Vermont court relied substantially on Evan, supra, 583 N.Y.S.2d at 1002, which, in allowing a same-sex partner adoption, noted that:
[t]his is not a matter which arises in a vacuum. Social fragmentation and the myriad configurations of modern families have presented us with new problems and complexities that can not be solved by idealizing the past. Today a child who receives proper nutrition, adequate schooling and supportive sustaining shelter is among the fortunate, whatever the source. A child who also receives the love and nurture of even a single parent can be counted among the blessed. Here this Court finds a child who has all of the above benefits and two adults dedicated to his welfare, secure in their loving partnership, and determined to raise him to the very best of their considerable abilities. There is no reason in law, logic or social philosophy to obstruct such a favorable situation.
The Vermont court concluded that:
[a]s the case law from other jurisdictions illustrates, our paramount concern should be with the effect of our laws on the reality of children's lives. It is not the courts that have engendered the diverse composition of today's families. It is the advancement of reproductive technologies and society's recognition of alternative *11 lifestyles that have produced families in which a biological, and therefore a legal, connection is no longer the sole organizing principle. But it is the courts that are required to define, declare and protect the rights of children raised in these families, usually upon their dissolution. At that point, courts are left to vindicate that public interest in the children's financial support and emotional well-being by developing theories of parenthood, so the "legal strangers" who are de facto parents may be awarded custody or visitation or reached for support. Case law and commentary on the subject detail the years of litigation spent in settling these difficult issues while the children remain in limbo, sometimes denied the affection of a "parent" who has been with them from birth.... It is surely in the best interests of children, and the state, to facilitate adoptions in these circumstances so that legal rights and responsibilities may be determined now and any problems that arise later may be resolved within the recognized framework of domestic relations law.
We are not called upon to approve or disapprove of the relationship between the appellants. Whether we do or not, the fact remains that Deborah has acted as a parent of B.L.V.B. and E.L.V.B. from the moment they were born. To deny legal protection of their relationship, as a matter of law, is inconsistent with the children's best interests and therefore with the public policy of this state, as expressed in our statutes affecting children. [Citations omitted.] [B.L.V.B., supra, 628 A.2d at 1276.]
We fully endorse this rationale.
There is one further issue we must address. Because the trial judge determined that the statute prohibited this adoption, he did not reach the question of whether it would be in the best interest of the twins. The question before us is whether we must remand for further consideration of that issue or whether the record is sufficiently complete and uncontroverted to enable us to make the determination without subjecting plaintiff and her partner to further litigation expense, anxiety, and delay. Based on this record, we see no purpose to be served by a remand.
The uncontradicted testimony of Hannah and Mary and the report and recommendation of the Children's Aid and Adoption Society leave no doubt that the twins' best interest will be served by the adoption. As we have noted, they are as fully bonded to Hannah as to Mary, and Hannah is no less committed to them than is Mary. They function together as a family. Whether the adoption is granted or not, the day-to-day lives of these two adults and the two children will not be materially different. The twins are, by reason of their upbringing, daily lives, and ties of mutual *12 affection, the children of both Mary and Hannah, and no court order granting or denying the adoption will change that. In that posture, we think it plain that the best interests of the twins will be served by according them the full range of legal and financial benefits attendant upon a legally cognizable parental relationship. There is no disadvantage that we can perceive. As the Supreme Court of Vermont similarly concluded in B.L.V.B.:
Because the probate court rejected these adoptions on legal grounds, it did not make findings on whether the adoptions were, in fact, in the best interests of the children. Ordinarily, this would require a remand to the probate court; however, in light of the fact that the adoptions were unopposed, that all of the evidence stands uncontroverted, that the adoption was investigated and recommended by the state, through SRS, and that there is not a scintilla of evidence in the record to suggest that the adoptions are not in the best interests of these children, no reason exists to remand for another hearing.
[Id. at 1276.]
The judgment appealed from is reversed, and we remand to the trial court for entry of an order allowing the adoption of Z. and M. by plaintiff H.N.R.
WEFING, J.A.D., dissenting.
My colleagues have concluded that the trial court erred when it dismissed the complaint for adoption filed by Hannah in which she sought to adopt the twin children born to her partner, Mary. My colleagues have done so in the face of a statute providing for the termination of Mary's parental rights over these twins, as a matter of law, if they are adopted by one other than a stepparent. I am unable to agree and thus dissent.
My colleagues have set forth in their opinion the facts of this matter and they need not be restated. What must be understood, however, is what this case is about and what it is not about. The matter before the court is one of statutory application; it is not about sexual orientation and it is not about approval or disapproval of the manner in which individuals live their lives.
N.J.S.A. 9:3-50 provides that a judgment of adoption absolutely terminates the parental rights of the natural parents unless, to the extent here pertinent, the plaintiff "is a stepfather or stepmother *13 of the adopted child and the adoption is consummated with the consent and approval of the mother or father, respectively."
My colleagues agree with Matter of Adoption of Child by J.M.G., 267 N.J. Super. 622, 632 A.2d 550 (Ch.Div. 1993), that this provision should not be construed in a manner that would defeat this adoption. I am, unfortunately, unable to agree.
Within J.M.G., the trial judge noted that he was "constrained by the state of the law from proclaiming J.M.G. an actual `stepparent,' given the fact that same-sex marriages are not legal in this state." 267 N.J. Super. at 628, 632 A.2d 550. The inevitable consequence of my colleagues' opinion, however, is to consider Hannah as a stepparent.
The consequences of holding Hannah as the legal equivalent of a stepparent are far-reaching. The term stepparent is generally understood to imply a marital relationship. Zaragoza v. Capriola, 201 N.J. Super. 55, 61, 492 A.2d 698 (Ch.Div. 1985). No matter how committed to one another Hannah and Mary may be on a personal level, they are, for now, precluded from marrying one another in New Jersey. M.T. v. J.T., 140 N.J. Super. 77, 83-84, 355 A.2d 204 (App.Div.), certif. denied, 71 N.J. 345, 364 A.2d 1076 (1976). They would be similarly unable to marry elsewhere. See, e.g., Peter G. Guthrie, Annotation, Marriage Between Persons of the Same Sex, 63 A.L.R.3d 1199 (1975).
It is not up to this court to either agree or disagree with the wisdom of the policy judgment this State has made in this regard. If there is to be any change in this regard, it should come from the legislative branch, rather than from us.
I recognize that our adoption statute permits "any person" to commence a proceeding for adoption. N.J.S.A. 9:3-43(a). The legislature has not restricted the statutory privilege of adoption to individuals who are married. I also recognize that our adoption statute is to be "liberally construed to the end that the best interests of children be promoted." N.J.S.A. 9:3-37. I am satisfied, however, that to permit Hannah to adopt these children is to *14 disregard the intent of our Legislature which, through use of the terms "stepfather or stepmother" created a very narrow exception to the principle that a judgment of adoption terminates any legal relationship between the adopted child and the birth parents. The judicial function is "to ascertain the intention of the Legislature from the plain meaning of the statute and to apply it to the facts. [If the statute] is clear and unambiguous, it [is] not open to construction or interpretation...." In re F.A.U., 190 N.J. Super. 245, 463 A.2d 344 (App.Div. 1983).
Our Legislature passed a comprehensive revision of our adoption statute in 1993, but specifically provided it would not become effective until April 27, 1994, and would apply to complaints for adoption filed "on or after the effective date." L. 1993, c. 345, § 23. Hannah's complaint for adoption was filed on March 15, 1994, and her action is thus governed under the 1977 adoption statute, still then in effect.
It is not inappropriate, however, to compare the existing language of N.J.S.A. 9:3-50, which sets forth the "stepparent" exception, with that contained in the revised statute. The revised version states:
The entry of a judgment of adoption shall: (1) terminate all parental rights and responsibilities of the parent towards the adoptive child except for a parent who is the spouse of the petitioner....
The Legislature did not say, in either version, "except for a parent who is the long-term partner of the petitioner." The chosen language indicates to me that the legislative intent was that if one partner seeks to adopt the child of the other partner, they should be married to one another. The Legislature is free to change that articulation of public policy if it desires, but we should not revise it through judicial construction. Our Supreme Court has recognized, for instance, that it "can be contended with some force that the Legislature's statutory coverage of the creation of the parent-child relationship evinces an intent to reserve to itself the power to define what is and is not a parent-child relationship." Matter of Baby M., 109 N.J. 396, 441-42 n. 10, 537 A.2d 1227 (1988).
*15 Clearly, if Hannah had filed her complaint on or after April 27, 1994, a court would have to conclude that Hannah was legally entitled to be considered a "spouse" under N.J.S.A. 9:3-50 to preserve Mary's parental rights. I am unable to conclude that that would reflect the intent of our Legislature.
Finally, my colleagues note that a judgment of adoption would not "effect any fundamental change in the way the family lives" (Op. at 5) but would confer certain financial benefits upon them. Similarly, to deny the judgment for adoption will not result "in any fundamental change" for them. Such benefits should be conferred legislatively, rather than judicially.
NOTES
[1] See, e.g., Polikoff, This Child Does Have Two Mothers: Parenthood to Meet the Needs of Children in Lesbian-Mother and Other Nontraditional Families, 78 Geo.L.J. 459 (1990); Delaney, Note, Statutory Protection of the Other Mother: Legally Recognizing the Relationship Between the Nonbiological Lesbian Parent and Her Child, 43 Hastings L.J. 177 (1991); Zuckerman, Comment, Second Parent Adoption for Lesbian-Parented Families: Legal Recognition of the Other Mother, 19 U.C.Davis L.Rev. 729 (1986).
[2] We are aware that this section, N.J.S.A. 9:3-50, was amended as part of the comprehensive revision of the adoption laws, L. 1993, c. 345, effective April 27, 1994. The amendment substituted the phrase "spouse of the petitioner" for the words "stepfather or stepmother." We do not, however, regard this amendment as intending to effect any substantive change  the change appears to be semantic and for gender neutralization purposes. We remain convinced that the Legislature has not yet directly addressed the issue before us.
[3] The case was decided at a time when the natural father of an illegitimate child was accorded no parental status. See former N.J.S.A. 3A:4-7 and N.J.S.A. 9:2-13(f), 9:2-19 and 9:3-18(f), all since amended or repealed.
[4] Insofar as we have been able to determine, the statutes of only two states, Florida and New Hampshire, dispose of the issue before us. The New Hampshire statute renders every homosexual person and every family unit of which a homosexual person is a member ineligible to adopt a child. N.H. Rev. Stat. Ann. §§ 170-B:4, -F:6 (1994). The Florida statute, Fla. Stat. Ann. § 63.042(3) (West 1995), also renders homosexual persons ineligible to adopt a child.