In the Matter of PETER J. SAROSI, Petitioner, v THOMAS SOBOL, as Commissioner of the New York State Education Department, et al., Respondents.

Third Department, March 29, 1990

## APPEARANCES OF COUNSEL

*Dickstein, Shapiro & Morin (Seymour Glanzer* of counsel), for petitioner.

*Robert Abrams, Attorney-General (Barbara K. Hathaway* of counsel), for respondents.

## OPINION OF THE COURT

HARVEY, J.

Petitioner, a physician licensed to practice in New York, is an obstetrician/gynecologist with a subspecialty in infertility. In May 1988, petitioner was arrested and charged with the unclassified misdemeanor of unlawfully placing a child for adoption in violation of Social Services Law § 374 (2) and § 389. Petitioner pleaded guilty to the charge admitting that he had, in June 1986, arranged for the placement of a baby boy, now known as Travis Smigiel, for adoption by Joel Steinberg and Hedda Nussbaum without complying with the appropriate provisions of the Social Services Law.

The mother of the baby boy, Nicole Smigiel, was an unwed teen-ager whose mother became suspicious of the pregnancy only a few days prior to the infant's birth. Upon the confirmation of the pregnancy by an on-call physician at a health clinic, Smigiel and her mother became hysterical. That physician convinced them that the baby should be placed out for adoption as discreetly as possible after the birth. This was apparently because Smigiel did not want the rest of her family to know about the birth. Petitioner was contacted and he agreed to deliver the child and to cooperate with the adoption plans in secrecy. He insisted that the child be placed with Steinberg, his attorney and business associate. Petitioner had been treating Steinberg and Nussbaum for infertility for some time. Although attorneys were contacted about the matter and Smigiel signed the papers surrendering her maternal rights, no adoption papers were ever filed. Petitioner did not seek or receive a fee for delivering or placing the boy and this was the only time he had ever participated in arrangements for an adoption. Petitioner told Smigiel that Steinberg

and Nussbaum were a "wonderful couple" and the baby would be well taken care of. Petitioner learned otherwise when Steinberg was arrested and ultimately convicted of manslaughter in connection with the death of Steinberg's other illegally adopted child, Lisa. The baby boy placed in the Steinberg home by petitioner, although found in a neglected state, was not injured and was ultimately returned to his natural mother.

In connection with the criminal charge against petitioner, Criminal Court of the City of New York sentenced petitioner, an individual with no criminal history, to three years of probation, 100 hours of community service and a $1,000 fine. In its decision, the court noted that, although many physicians in New York were unfamiliar with Social Services Law § 374 (2) and § 389 and may have unwittingly violated these provisions, "ignorance of the law is no excuse". Based on this criminal conviction, the Office of Professional Medical Conduct initiated a disciplinary proceeding against petitioner charging him with professional misconduct for having been convicted of an act constituting a crime. The proceeding was directly referred to the Regents Review Committee for a hearing with the evidence to be limited to that which related to the possible penalty to be imposed on petitioner (see, Public Health Law § 230 [10] [m] [iv]). At the hearing, petitioner testified on his own behalf and several other witnesses testified favorably for petitioner. In addition, petitioner submitted as evidence almost 200 letters of support from colleagues and patients. At the conclusion of the hearing, the prosecuting attorney from the Department of Health stated that the Commissioner of Health recommended a penalty of one year's actual suspension. The report by the Regents Review Committee found that the charge against petitioner was proven by a preponderance of the evidence and unanimously recommended to respondent Board of Regents (hereinafter the Board) that petitioner's license to practice medicine be suspended for three years, with the last 30 months of said suspension to be stayed at which time petitioner would be placed on probation for 30 months. The terms of probation were to include monitoring petitioner's practice to ensure that he was not involved with any adoptions.

The Board ultimately voted to accept the Committee's findings of fact and determination of guilt, but as to penalty, the Board stated that it took a "more serious view of [petitioner's]

misconduct" and voted to revoke petitioner's license.[1] Thereafter, respondent Commissioner of Education issued an order in May 1989 effectuating the Board's vote and petitioner commenced this CPLR article 78 proceeding to annul the Commissioner's determination.[2]

Petitioner principally contends that the penalty of revocation imposed by the Commissioner is excessively harsh, arbitrary and capricious, and an abuse of discretion. With these contentions we must agree. An examination of all the facts and circumstances present in this case leads us to the conclusion that we have been presented with the rare instance where the penalty imposed is " 'so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness' " (Matter of Pell v Board of Educ., 34 NY2d 222, 233, quoting Matter of Stolz v Board of Regents, 4 AD2d 361, 364).

The record establishes without dispute that petitioner, an extremely competent and highly regarded physician with a heretofore unblemished record, violated a statute which was unfamiliar to the general public and not previously enforced except in cases of black market "baby selling" (see, e.g., People v Michelman, 93 Misc 2d 297). Petitioner testified that he was unaware that a doctor's placement of a child was illegal and that he had known other physicians in the past who had done so on numerous occasions. The criminal prosecution of petitioner was apparently the first of its kind in that jurisdiction involving a doctor and the Regents Review Committee in this proceeding acknowledged in its report that this matter was "a case of first impression".

Looking to all the circumstances surrounding the illegal adoption itself, we cannot find that the Commissioner's penalty is proportionate to the offense. It is significant that respondents do not dispute that petitioner's motive was his unselfish desire to assist his patient and to find what he believed to be a good home for the baby. However, he had a serious lapse of judgment in not referring the Smigiels to an authorized agency. It is unquestioned that petitioner took no fee and genuinely believed that he was doing a good deed. While petitioner's lapse in judgment in placing the child was

---

1. The vote was not unanimous; one member of the Board dissented, favoring the Regents Review Committee's recommendation as to penalty.

2. In June 1989, this court stayed the revocation order pending the outcome of this proceeding.

a serious one considering the potential consequences that could have occurred, the seriousness of the crime in the instant case is more clearly seen with benefit of hindsight. In other words, if Steinberg and Nussbaum had been the loving parents petitioner had assumed them to be, it is difficult to imagine that the Commissioner would implement the most severe penalty possible for the violation, an unclassified misdemeanor unrelated to the actual practice of medicine. Although this factor is not dispositive, it is interesting to note that respondents do not seriously dispute petitioner's assertion that they routinely administer less severe sanctions to professionals for what could be considered far more culpable conduct such as assault or molesting patients.

This is not to say that the seriousness of petitioner's offense should be minimized. The provisions within the Social Services Law requiring rigorous screening of potential adoptive parents are designed to avoid the exact tragedy that occurred in the Steinberg household. As serious as petitioner's conduct was, however, it did not justify the harsh penalty imposed by the Commissioner in light of all the circumstances.

Also to be considered in regard to the penalty is the "prospect of deterrence of both those charged or of others in like situations from recurrence of derelictions and that the sanctions reflect the standards of society to be applied to the offense involved" *(Matter of S. & J. Pharms. v Axelrod,* 91 AD2d 1131, 1132; *see, Matter of Pell v Board of Educ., supra,* at 234). Here, certainly the extensive publicity surrounding petitioner's criminal conviction already has performed that function to a large extent. As much as the public is justly outraged by the acts of Steinberg, it must be remembered that the face of a child abuser or spouse batterer is a hidden one, not easily detected by the outside world prior to a tragedy. Petitioner must be punished for his failure in professional judgment as a physician, not his poor taste in the selection of friends. Another factor to be considered is the voluminous unchallenged information in the record regarding petitioner's worth as a doctor and human being to both colleagues and patients. There is no logic in punishing petitioner's patients by depriving them of a competent doctor when the record gives every indication that petitioner's lapse was an isolated one extremely unlikely to be repeated and the medical community would be sufficiently warned by a more proportionate penalty *(see, De La Cadena v Perales,* 114 AD2d 797, 798-799).

In sum, it is our considered view that imposition of the most

severe sanction available, revocation, was disproportionate to the charged misconduct. Accordingly, that part of the Commissioner's determination that imposes a penalty must be annulled and the matter remitted to respondents for reconsideration of the penalty *(see, Matter of Ahsaf v Nyquist,* 37 NY2d 182; *Matter of Krasowski v State Educ. Dept.,* 132 AD2d 120, *appeal dismissed* 71 NY2d 890). Regarding the penalty, we note parenthetically that we would find any penalty imposed by respondents that would be more severe than that recommended by the Regents Review Committee to be similarly excessive. In light of our decision as to the penalty imposed upon petitioner, it is unnecessary to reach his remaining arguments.

KANE, J. P., MIKOLL, YESAWICH, JR., and MERCURE, JJ., concur.

Determination modified, without costs, by annulling so much thereof as imposed a penalty on petitioner; matter remitted to respondents for further proceedings not inconsistent with this court's decision; and, as so modified, confirmed.