OPINION OF THE COURT
Edward M. Kaufmann, J.
In these private placement adoption proceedings, infants were placed with prospective adoptive parents in violation of *894 the Interstate Compact on the Placement of Children and New York’s laws requiring certification of prospective adoptive parents as "qualified adoptive parents”. Inexplicably, the administrator of the Interstate Compact gave approval for the placements. I have been informed that these cases are by no means isolated instances of violations of New York’s private placement adoption laws. I, therefore, write to call attention to the problem.
I
In Matter of Male Infant A., petitioner Mr. and Mrs. S. hired a California attorney and two New York attorneys to assist them in attempting to adopt a child. On the advice of their first New York attorney, they caused a preplacement investigation to be undertaken in August 1990, and a certified social worker completed the investigation of them that same month. Mr. and Mrs. S. retained present counsel in November 1990. Although present counsel advised them to initiate New York’s certification process immediately, they waited until May 21, 1991 to file a petition for certification. They submitted with the petition a copy of the 1990 preplacement investigation, a financial statement showing them to own more than $5 million in property, and a copy of their 1989 tax return showing them to have an income of $1,500,000. The tax return lists Mr. and Mrs. S. as residents of the State of Connecticut. The date the certification petition was filed, the court ordered a report on Mr. and Mrs. S. from the State-wide Central Register of Child Abuse and Maltreatment.
Shortly after the certification petition was filed, in June 1991, the natural mother of the infant, who is the subject of the proceedings, responded to a newspaper advertisement and decided to place the infant with Mr. and Mrs. S. On July 2, 1991, counsel wrote a letter to the adoption clerk stating that the birth of the infant was imminent, and submitted an application for preapproval of certain adoption expenses. Counsel did not submit an application to waive the certification process.
The infant was born on July 7, 1991, in Madison, Wisconsin. On August 6, 1991, the administrator of the Interstate Compact in this State[1] granted approval for placement of the *895 infant with Mr. and Mrs. S. and the infant was transferred to their physical custody that day.
On August 14, 1991, Mr. and Mrs. S. filed petitions for temporary guardianship and adoption, listing their residence as New York County. They also made application for a waiver of the certification process. The affirmation of counsel in support of the application for waiver of certification states that all documents were filed with the court in May 1991. In fact, a response from the State-wide Central Register of Child Abuse and Maltreatment was received by the court on September 13, 1991. The waiver application contains this statement: "It is apparent that if the normal procedures of precertification are followed in this case, that the anticipated adoption would be jeopardized, since the child was born prior to certification. Accordingly, it is requested that the court waive pre-certification requirements.”
In Matter of Female Infant C., petitioner Ms. R. filed a petition for certification on July 3, 1990. Ms. R. then waited some nine months before taking action to submit documentation required for certification. The last required document, a letter explaining the circumstances of her criminal record, was submitted on May 20, 1991. Ms. R. submitted a financial statement showing her to own property worth approximately $500,000, and a copy of her 1990 tax return showing her to have an income of approximately $40,000. The tax return lists Ms. R. as a resident of Nassau County.
The infant who is the subject of these proceedings was born on May 23, 1991 in Grand Island, Nebraska. On May 25, 1991, physical custody of the infant was transferred from the birth mother to Ms. R. On May 28, 1991, the administrator of the Interstate Compact gave approval for the placement of the infant with Ms. R.
On May 31, 1991, Ms. R. filed petitions for temporary guardianship and adoption, listing her residence as New York County. Ms. R. has never made application for a waiver of the certification process. Counsel wrote a letter to the adoption clerk, dated May 31, 1991, stating: "The certification Order * * * is before the Judge and we are awaiting the signed order.”
The same attorney represents the prospective adoptive par *896 ents in both of these proceedings. On consent, I questioned him in chambers without the presence of his clients. He stated that it has been his practice in this and other courts to make applications for waiver of the certification process after physical custody of children has been transferred to prospective adoptive parents. Counsel explained: "And the problem that exists in the state * * * is that there is no common practice * * *. Now, yes, the law is one thing in black and white, but * * * judges have very different rules and procedures.”
II
Until very recently in New York, it was common practice for natural parents in private placement adoptions to turn over physical custody of infants to prospective adoptive parents at the time an extrajudicial consent to adoption was executed, and for the infants to remain with the prospective adoptive parents a considerable period of time before guardianship or adoption proceedings were initiated in court. In 1987 and 1988, instances came to light where some of these children were abused following their placement with prospective adoptive parents. One such instance was the tragic death of Lisa Steinberg.
In 1988, legislation was enacted to require that prospective adoptive parents in private placement adoptions file for temporary guardianship of the person of the child or a petition for adoption within 10 court days after receiving physical custody of the child. (Domestic Relations Law § 115-c; SCPA 1725, both added by L 1988, ch 557, eff Oct. 1, 1988.) Under this legislation, until a homestudy was conducted, the court still had only the information about the infants’ de facto custodians that was provided by the prospective adoptive parents.
In 1989, new legislation was enacted to remedy deficiencies of the 1988 legislation. This legislation, which was recommended by an eight-month Grand Jury investigation conducted in the wake of the infamous Steinberg case (see, Report of Fifth Grand Jury, NY County Sup Ct, April/May Term 1988, at 38-39), now requires that prospective adoptive parents be certified as "qualified adoptive parents” by a court before they receive physical custody of a child (Domestic Relations Law § 115 [1] [b]; § 115-d, enacted by L 1989, ch 700, eff Nov. 1, 1989).
Persons seeking physical custody of children in private placement adoptions must now furnish the court with a *897 preplacement investigation undertaken by a disinterested person (Domestic Relations Law § 115-d [1] [d]), or request the court to appoint a disinterested person to conduct such an investigation (Domestic Relations Law § 115-d [2]).
The certification process may be waived prospectively, upon application, for good cause shown (Domestic Relations Law § 115 [1] [bj; § 115-c). Where the certification process has been waived and prospective adoptive parents then take physical custody of a child, the "parents” must file a petition for temporary guardianship or petition for adoption within 5, and not 10, court days (Domestic Relations Law § 115-c).
A waiver is not to be routinely granted. It would appear to be appropriate where "due to exigent circumstances, the adoptive parents could not timely pursue a certification application, or where the certification process was not, through no fault of the adoptive parents, completed prior to the scheduled transfer of physical custody” (Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Domestic Relations Law, Book 14, 1991 Pocket Part, at 77). Before granting a waiver, the court should conduct an expedited hearing to assure itself of the fitness of the prospective adoptive parents (id..).
Supporters of the 1989 legislation warned about potential abuse of the waiver provision of the proposed statute. They feared that prospective adoptive parents, on advice of counsel, might wait until just prior to the birth of a child and then request a waiver by arguing that the child would suffer by being forced to remain in a hospital or foster care if not placed with them immediately (Bill Jacket, L 1989, ch 700, mem of State Commr of Social Servs). To prevent the waiver provision from becoming "a huge loophole defeating the purpose of the law”, supporters recommended the adoption of court rules establishing strict criteria for a waiver of the certification process (Bill Jacket, L 1989, ch 700, mem of Council of Family and Child Caring Agencies). No court rules have to date been enacted.
Ill
The Interstate Compact on the Placement of Children, enacted in New York as Social Services Law § 374-a in 1960 (L 1960, ch 708), must be complied with before a child is placed from another State with prospective adoptive parents in New York (Social Services Law § 374-a [1], arts II, III [a]; Hartfield, The Role of the Interstate Compact on the Placement of *898 Children in Interstate Adoption, 68 Neb L Rev 292, 313-314 [1989]; see, Matter of Male D., 137 Misc 2d 1016 [Fam Ct, NY County 1987]).
The purpose of the Interstate Compact is to protect children transported interstate and to maximize their opportunity to be placed in a suitable environment with persons able to provide the necessary and desirable level of care for them (Social Services Law § 374-a [1], art I). To this end, the Interstate Compact requires advance notification of the proposed placement to the appropriate authorities in the State which would be receiving a child so that they may have an opportunity to investigate (Social Services Law § 374-a [1], arts I, HI [b]).
Article III of the Interstate Compact sets out the general requirements for a valid interstate placement. Paragraph (a) of article III prohibits a "sending agency” from sending, bringing or causing "to be sent or brought into any other party state any child[2] * * * as a preliminary to a possible adoption unless the sending agency shall comply * * * with the applicable laws of the receiving state[3] governing the placement[4] of children therein.” (Social Services Law § 374-a [1], art III [a].)
"Sending agency” is defined to include an officer or employee of a party State or one of its subdivisions, a court or a party State, a private agency, an individual, corporation, association or other entity which sends, brings or causes to be sent or brought any child to another party State. (Social Services Law § 374-a [1], art II [b].)
Each State that is a party to the Interstate Compact has a *899 compact administrator (Social Services Law § 374-a [1], art VII). Before approving any transfer of a child interstate, the compact administrator in the receiving State is required to make a determination that the proposed placement complies "with the applicable laws of the receiving state governing the placement of children therein.” (Social Services Law § 374-a [1], art III [a].)
IV
Under the 1989 legislation, there is no penalty for failure to comply with the certification laws in an intrastate adoption other than denial of the adoption (see, Bill Jacket, L 1989, ch 700, letter of Exec Dir of Council on Children and Families dated July 19, 1989).
There are, however, two kinds of penalties for a placement made in violation of the Interstate Compact. First, a violation of the Compact is deemed a violation of the child placement laws of both the sending and receiving States and may be punished as such in either State. Second, the violation constitutes grounds for the suspension or revocation of a license to place or care for children (Social Services Law § 374-a [1], art IV).[5]
In New York, "any person, corporation, agency, society, institution or other organization, wilfully violating [the Interstate Compact] * * * shall be guilty of a misdemeanor” (Social Services Law § 389 [1]).
The definition of who is a "sending agency” under the Compact is important because it is the "sending agency” that must comply with Compact requirements or be penalized for an illegal placement (Social Services Law § 374-a [1], arts III, IV). The definition of sending agency is broad enough to include any individual or entity that causes a child to be moved interstate. In a given placement, a number of individuals or entities could be deemed the sending agency. In addition to the obvious sending agency, the parent or entity which places the child, the recipient of a child is also a sending agency if it causes a child to be sent or brought across State lines (In re Adoption of C.L. W., 467 So 2d 1106 [Fla Dist Ct *900 App, 2d Dist 1985] [per curiam]; see, Matter of T.M.M., 186 Mont 460, 608 P2d 130 [Sup Ct 1980]).
V
In both of these proceedings, children were placed in violation of New York’s certification law and the Interstate Compact. Inexplicably, the compact administrator in this State gave approval for both placements when he should have first demanded to see a court order granting certification or an order waiving the certification process.[6]
In each proceeding, it is questionable whether a waiver would have been granted. Neither Mr. and Mrs. S. nor Ms. R. took prompt action to comply with New York’s certification laws. Mr. and Mrs. S. waited many months to file a petition for certification after they were informed of the necessity of doing so. Ms. R. filed her petition promptly, but then waited many months before taking action to complete the necessary documentation. Neither can claim financial reasons for their inaction.
Courts are justifiably reluctant to deny adoptions because of violations of the adoption laws (see, Matter of Baby E., 104 Misc 2d 185 [Fam Ct, NY County 1980]; Matter of Juan P. H. C., 130 Misc 2d 387 [Sur Ct, Bronx County 1985]; Matter of Tersigni [Carballo], 137 Misc 2d 553 [Fam Ct, Schenectady County 1987]; Matter of Calynn M. G., 137 Misc 2d 1005 [Sur Ct, Nassau County 1987]; but see, Matter of Samuel, 167 AD2d 909; Matter of Jon K., 141 Misc 2d 949 [Fam Ct, Kings County 1988]). In denying an adoption for violation of the adoption laws, a child may be deprived of the only home he or she has ever known and returned to a natural parent marginally capable of providing care for the child or placed into foster care. However, the finalization of adoptions, despite violations of the adoption laws, only encourages subsequent violations.
Recently, New York courts have utilized financial sanctions against attorneys for failure to comply with adoption laws *901 (see, Matter of Tersigni [Carballo] supra; Matter of Calynn M. G., supra; Matter of Baby Boy H., NYLJ, Oct. 21, 1991, at 29, col 3 [Fam Ct, Westchester County]). Although this may be fair, I seriously doubt whether such a sanction is sufficient to deter future violations of law.
Here the children were placed interstate. Thus, if the law governing certification was "wilfully” violated, Mr. and Mrs. S., Ms. R, the Wisconsin agency, the natural mother of the infant now in the de facto custody of Ms. R and, perhaps, others are guilty of a misdemeanor (Social Services Law § 389 [1]).
I have now caused to be sent to every attorney and prospective adoptive parent who files a petition for certification before me a letter clearly delineating the requirements of New York’s certification laws and my expectation that the laws be fully respected. Should there be future violations, I will immediately refer the matter to appropriate attorney disciplinary committees and/or appropriate prosecutorial authorities. Referral of violations of adoption laws to disciplinary committees and/or prosecutorial authorities may be a fair and effective way to enforce adoption laws where an adoption is otherwise desirable. (See, Matter of Samuel, supra, at 912 [Pine, J., dissenting].) In this way, children would not suffer the consequences of adult violations of law.
I cannot rule out, however, denial of an adoption in cases where the laws have been violated. In some instances, this may be appropriate. It is certainly an alternative which should be available where prospective adoptive parents knowingly violate this State’s adoption law (see, Matter of Juan P. H. C., supra, at 391). I leave the question of an appropriate remedy open in these proceedings because it is unclear at this time whether the courts of New York have jurisdiction over the adoption in Matter of Male Infant A.,[7] and whether venue *902 lies in New York or Nassau County in Matter of Female Infant C.[8] I have scheduled an expedited hearing on these issues.

. The compact administrator in the State of New York is the State Commissioner of Social Services, or his or her designee (see, Social Services *895 Law § 374-a [1], art VII; Commissioner of Social Services’ Administrative Directive Concerning Interstate Compact on the Placement of Children [85 ADM 22]).

. Article II of the Interstate Compact defines "child” as "a person who, by reason of minority, is legally subject to parental, guardianship or similar control.” (Social Services Law § 374-a [1], art II [a].)

. "Receiving state” is defined as "the state to which a child is sent, brought, or caused to be sent or brought, whether by public authorities or private persons or agencies, and whether for placement with * * * private agencies or persons.” (Social Services Law § 374-a [1], art II [c].)

. "Placement” is defined as "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution” (Social Services Law § 374-a [1], art II [d]). "Family free” home is not defined in the Interstate Compact; it means a family home in which a child lives without charge and is provided "the care which children usually receive from their parents as part of the process of upbringing” (American Public Welfare Assn, The Interstate Compact on the Placement of Children: Compact Administrators’ Manual 2.2 [Compact Provisions, An Interpretative Summary] [1982]).

. Revocation of an authorized agency’s license would render it unable to place or board out children in this State. Only a licensed, authorized agency may place or board out children in New York (Social Services Law § 374 [1]; § 371 [10]; Matter of Unnamed Baby Boy, 110 AD2d 1019; Matter of Samuel, 167 AD2d 909).

. The State Commissioner’s own regulations governing his administration of the Interstate Compact (85 ADM 22) were last revised in 1985 and, therefore, contain no reference to the 1988 or 1989 legislative enactments. Thus, the compact administrator has apparently regularly approved placements in New York without regard for these statutes.

. At a minimum, "[t]he Domestic Relations Law contemplates the residence in New York of either the adoptive parents or the adoptive child”. (Barry E. v Ingraham, 43 NY2d 87, 93.) Thus, if neither the adoptive parents nor the adoptive child are residents of this State, the adoption proceeding should be dismissed (Matter of Male Infant M., NYLJ, Apr. 8, 1991, at 28, col 2 [Fam Ct, Bronx County]; Matter of Danielle, 88 Misc 2d 78 [Sur Ct, Putnam County 1976]).

. Under Family Court Act § 174, a proceeding incorrectly filed in one county of this State must be transferred to the county where the proceeding should have been originated (Besharov, Practice Commentary, McKinney’s Cons Laws of NY, Family Ct Act, Book 29A, at 136; see also, Matter of Fusco v Roth, 100 Misc 2d 288 [Fam Ct, Richmond County 1979]; Murray v Murray, 123 Misc 2d 37 [Fam Ct, Ulster County 1984]). Here, since the child is not a resident of New York County, and Ms. R. may be a resident of Nassau County, venue may properly lie in Nassau County.