OPINION OF THE COURT
Paula J. Hepner, J.
Before the court is an application made pursuant to Uniform Rules for Trial Courts (22 NYCRR) § 205.55 requesting this court to accept for filing an adoption petition which was submitted to the clerk on July 24, 1994 and returned by him, pursuant to section 115-b (5) of the Domestic Relations Law, on the ground that the petition was not "complete on its face” since the petitioner has neither been certified as a "qualified adoptive parent,” pursuant to Domestic Relations Law § 115 (1) (b), nor has she received a waiver of the statute’s preplacement certification requirement.[1] The Adoption Clerk rejected the petition for the additional reason that the petitioner is ineligible to claim an exemption from the preplacement certification requirement which is available to stepparents under Domestic Relations Law § 115-d (8).[2] Because S.M.Y. seeks to adopt Camilla as a "second parent,” she asks this court to find that the stepparent exemption in Domestic Relations Law § 115-d (8) applies to the facts of the instant matter and, *274 therefore, she need not become certified before the adoption petition can be filed. In the alternative, S.M.Y. asks this court to waive the preplacement certification requirement of Domestic Relations Law § 115 (1) (b) because she has demonstrated good cause therefor.
The preplacement certification requirement of Domestic Relations Law § 115 was enacted by the Legislature in the wake of the horrific Lisa Steinberg case. Senate Bill 21-B was introduced at the request of the New York State Department of Social Services. Enacted as chapter 700 of the Laws of 1989, the statute amended the procedures for private-placement adoptions to require certification of prospective adoptive parents as "qualified adoptive parents” prior to submitting a petition for adoption and prior to the transfer of physical custody of the child.[3]
Two justifications for this Bill are apparent in the legislative history. Under then-existing law, a prospective adoptive parent was "not investigated by a disinterested person until after the child has been placed in the adoptive home, an adoption petition has been filed and the court has ordered that a home study be conducted.”[4] Months, if not years, could pass from the date a child entered the home until the adoption was approved and during this time, the home would not be supervised by any outside agency.[5] A second reason for the passage of Senate Bill 21-B was the realization that "natural parents usually know little or nothing about the adoptive parents with whom they are placing their child * * * [t]he adoptive parent may deceive the natural parent and/or the adoptive parent’s counsel as to his/her suitability and intentions to adopt.”[6] Until Domestic Relations Law § 115-d was enacted, the responsibility for determining whether the prospective adoptive parents were fit rested solely with the natural parent. (Matter of *275 Mary R., 157 Misc 2d 1009, 1012 [Fam Ct, Broome County 1993]; Matter of Male Infant A., 150 Misc 2d 893, 896 [Fam Ct, NY County 1991].) As a result, children would routinely end up in homes of prospective adoptive parents "whose background and fitness [has] not been properly investigated and whose custody has not been judicially sanctioned.” (Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 115-d, 1994 Pocket Part, at 133.) The 1989 amendments to Domestic Relations Law § 115 enable courts to employ the "most thorough-going scrutiny of prospective adoptive parents before a child [is] placed in their home [and then to] monitor * * * the child’s sojourn in a preadoptive home.” (Matter of A., 158 Misc 2d 760, 761 [Fam Ct, NY County 1993].)
V.B., age 38, and the petitioner S.M.Y., age 36, have lived together in a committed lesbian relationship of nine years’ duration. Five years ago they decided to begin a family and through alternative insemination, a female child was conceived and born to V.B. on March 1, 1993.[7] The name recorded on the child’s birth certificate is Camilla Joanne Y.-B., which is a combination of last names of both women. Since her birth, Camilla has lived continuously with her mother and S.M.Y., who has already assumed the parental role and is discharging parental responsibilities. V.B. consents to the proposed adoption by S.M.Y. So long as V.B. chooses to continue her domestic partnership with S.M.Y., this child will enjoy the love, guidance and parenting of the petitioner, regardless of whether this adoption is ultimately finalized. The child is already in the custody of S.M.Y. and will remain there with her biological mother whether or not this court requires her to become "pre-certified.” In situations of this type, the purpose for which the statute was enacted and the harm it was designed to prevent are not present.[8]
*276 The goals of the preplacement investigation are to "determine if the applicant is a suitable person to adopt a child and must confirm that there is nothing about the applicant which would be a negative factor affecting his or her suitability to be an adoptive parent [and] whether the best interest of the child would be served by placement in the home of the adoptive parent.” (Matter of Michael JJ., 200 AD2d 80, 82 [3d Dept 1994].) S.M.Y. is eligible to adopt a child under Domestic Relations Law § 110 as an "adult unmarried person.” Applications to adopt a child from an unmarried adult may not be rejected "solely on the basis of homosexuality,”[9] therefore, the petitioner’s suitability is not negatively affected merely because she is a lesbian.
This court is aware of only two cases in the United States which address the question of preplacement certification of gay, lesbian or bisexual adoptive parents. In Matter of Pima County Juvenile Action B-10489 (151 Ariz 335, 337, 727 P2d 830, 832 [1986]), the appellate court affirmed the juvenile court’s determination that the petitioner, a bisexual male, was not suitable to adopt a child because he "is a bisexual individual who has had, and may have in the future, sexual relationships with members of both sexes.” The Arizona Court of Appeals affirmed for the reason that "[i]t would be anomalous for the state on the one hand to declare homosexual conduct unlawful and on the other create a parent after that proscribed model, in effect approving that standard, inimical to the natural family, as head of a state-created family.” (Supra, 151 Ariz, at 340, 727 P2d, at 834.) Unlike Arizona, New York’s consensual sodomy statute has been declared unconstitutional (People v Onofre, 72 AD2d 268 [4th Dept 1980], affd 51 NY2d 476 [1980], cert denied 451 US 987 [1981]), and as a result the petitioner in this matter cannot be negatively affected because her sexual conduct is criminally proscribed.
The second case on point is Matter of Christine (NYLJ, June 16, 1994, at 30, col 5 [Sur Ct, Kings County]). The petitioner, the unmarried lesbian partner of the infant’s unmarried biological mother, was found to be unsuitable because the child could not be adopted without terminating the parental rights of the biological mother.[10] The Surrogate found that *277 Domestic Relations Law § 110 restricts the individuals who can adopt jointly with a biological parent to "situations * * * where the two ultimáte parents are married” (supra, at 30, col 6) and that Domestic Relations Law § 117 (1) (a) automatically relieves the natural parents of "all parental duties toward and of all responsibilities for [the] child” once an order of adoption is made.* [11]
Two courts in New York (Matter of Evan, 153 Misc 2d 844 [Sur Ct, NY County 1992]; Matter of Caitlin, 163 Misc 2d 999 [Fam Ct, Monroe County]), the Supreme Judicial Court of Massachusetts (In re Tammy, 416 Mass 205, 619 NE2d 315 [1993]) and the Supreme Court of Vermont (In re B.L. V.B., 160 Vt 368, 628 A2d 1271 [1993]) have held that same-sex couples may jointly adopt a child without terminating the parental rights of the biological parent.[12] The statutes in Vermont and Massachusetts, like Domestic Relations Law § 117, provide for termination of the natural parent’s rights by operation of law after the adoption is finalized. The Supreme Court of Vermont looked to the purpose behind the automatic termination provision and found that it was necessary because in the majority of adoptions it is anticipated that children will be removed from the home of their biological parent(s). The Supreme Judicial Court of Massachusetts found that the automatic termination provision was only intended to apply when the natural parent is not a party to the adoption petition. The Supreme Court of Vermont held it would be "against common *278 sense to terminate the biological parent’s rights when that parent will continue to raise and be responsible for the child, albeit in a family unit with a partner who is biologically unrelated to the child.” (In re B.L. V.B., supra, 160 Vt, at 372, 628 A2d, at 1274.)
At the time the adoption statute was enacted in 1938, New York also enacted an exception to prevent the automatic termination of a biological parent’s rights when that person’s spouse was the adoptive parent.[13] The language of the statute reflects the traditional nuclear family structure as it existed in 1938 and continued to exist through the 1970’s, that is, children living in marital homes comprised of two parents. Since 1970, the evolving nature of the nuclear family, however, can be seen in the data collected by the United States Bureau of the Census. In 1990, only 70% of American children resided in marital homes with both biological parents. Nearly 14% of the Nation’s children resided with one parent in nonmarital homes shared with another adult.[14] In 1993, there were 3.5 million "unmarried couple households” with children. Unmarried couple households now comprise 35% of all households and represent a sevenfold increase from 1970.[15] The 1990 census counted unmari' A partnerships of the same and opposite sex for the first time. The statistics show there were 145,000 "unmarried partner households” of the same sex and over 3 million "unmarried partner households” of the opposite sex.[16] With the myriad of reproductive techniques available to unmarried women for having children besides heterosexual intercourse (frozen embryos, in vitro fertilization, alternative insemination, etc.), coupled with the elimination of the social stigma attached to having children "out of wedlock,” it is obvious that there will be an increasing number of *279 children similarly situated to Camilla, for whom legal protections will be sought through the adoption process.[17] To suggest that adoption petitions may not be filed by unmarried partners of the same or opposite sex because the Legislature has only expressed a desire for these adoptions to occur in the traditional nuclear family constellation of the 1930’s ignores the reality of what is happening in the population.[18]
Adoption is a statutory right having been unknown at common law. The primary function of adoption remains unchanged since the original statute’s enactment in 1873 and that is to provide for a child’s financial[19] and emotional security.[20] The goal of this adoption is to give legal effect to the parent-child relationship between the petitioner and Camilla, and to supplement the child’s life with the financial and emotional security which the petitioner can provide. The purpose of this adoption is not to create a nonmatrimonial legal status for the relationship between the petitioner and the child’s biological mother. (Matter of Robert Paul P., 63 NY2d 233, 239 [1984].) It is simply to give legal recognition to Camilla’s relationship to her second-parent, just as the law recognizes a stepparent who has assumed all of the financial and emotional responsibilities for a step-child.[21] Viewed in the *280 context of the 1990’s, stepparent adoption is nothing more than one form of second-parent adoption.
Courts have long construed statutes to meet the changing needs of our growing society, providing the interpretation honors the inherent legislative purpose. (Braschi v Stahl Assocs. Co., 74 NY2d 201 [1989].) In Braschi, at issue was the interpretation of the word "family” as used in the New York City Rent and Eviction Regulations. The Court of Appeals reversed the Appellate Division’s ruling that the regulations provide protection only for people in traditional, legally recognized familial relationships. To reach its result, the Court of Appeals held that "the term 'family’ * * * should not be rigidly restricted to those people who have formalized their relationship by obtaining * * * a marriage certificate or an adoption order. The intended protection against sudden eviction should not rest on fictitious legal distinctions or genetic history, but instead should find its foundation in the reality of family life.” (Braschi v Stahl Assocs. Co., supra, at 211.) If the phrase "second-parent” is not viewed as the entomological successor to the phrase "step-parent,” the law would mean that only married heterosexuals have the privilege of raising a family whose children enjoy all of the legal rights and benefits appertaining thereto. Courts should not be blind to modern-day realities in giving definition to statutory concepts. (Gay Teachers Assn, v Board of Educ., NYLJ, Aug. 23, 1991, at 22, col 3 [Sup Ct, NY County], affd 183 AD2d 478 [1st Dept 1992].) For this reason, the adoption statute historically has been "most liberally and beneficiently applied” (Matter of Malpica-Orsini, supra, at 572), in order to assure the best interests of the child.
CONCLUSION
Because Domestic Relations Law § 115 (1) (b) was not intended to apply to the facts before the court, and because the purpose of the statute would not be advanced by requiring the petitioner in this proceeding to become certified as a "qualified adoptive parent” as a condition precedent to her *281 filing this adoption petition, the court finds that good cause has been demonstrated to waive the preplacement certification requirement.
Because the language of Domestic Relations Law § 115-d (8) is interpreted to apply to all "second-parent” adoptions, the court finds that the preplacement certification exemption is applicable to the facts of this case.
Because the exception in Domestic Relations Law § 117 (1) (d) is interpreted to apply to all "second-parent” adoptions, the court finds that the petitioner is not rendered unsuitable to adopt because the biological parent’s rights would have to be terminated. Accordingly, it is ordered that the Adoption Clerk accept the petition and its exhibits for filing and the date of filing, for purposes of Domestic Relations Law § 116 (1) is July 24, 1994; and it is further ordered that Patricia Martin-Gibbons is assigned as Law Guardian for the child. She is to make her own independent assessment of the child’s surroundings, circumstances and condition; and it is further ordered, pursuant to Domestic Relations Law § 116 (3), that Judith Kaufman, Ph D investigate the allegations set forth in the petition, including but not limited to the educational background, employment history, religious practices, financial condition, emotional functioning and support systems of the adoptive parent.

. Domestic Relations Law § 115 (1) (b) provides that persons "seeking to commence a private-placement adoption shall, prior to the submission of a petition for such adoption and prior to any transfer of physical custody of an adoptive child, be certified as a qualified adoptive parent or parents by a court of competent jurisdiction * * * The provisions of such section may be waived upon the court’s own motion or upon the application of any party for good cause shown.”

. Under Domestic Relations Law § 115-d (8) the precertification provisions "shall not apply to petitions brought by a step-parent for the adoption of a step-child where the step-child has resided with the natural parent and the step-parent for a continuous period of at least one year.”

. Domestic Relations Law § 115-d (6) provides that if "the court grants the application, the applicant or applicants may accept physical custody of a child for the purposes of adoption, either prior to or contemporaneous with the filing of an adoption petition.”

. NY Dept of Social Servs, Mem in Support of Senate Bill 21-B, at 3, July 19, 1989.

. Even though the prior statute required prospective adoptive parents to file for the adoption of a child or for temporary guardianship of a child within 10 days of taking physical custody of a child, these requirements were easily and frequently disregarded. (NY Council on Children & Families, Mem in Support of Senate Bill 21-B, July 19, 1989.)

. NY Dept of Social Servs, Mem in Support of Senate Bill 21-B, at 4, July 19, 1989.

. The sperm donor is known to both the petitioner and the child’s biological mother. Pursuant to the terms of a written agreement between the parties, he has waived all parental rights to Camilla and has executed an extrajudicial consent to the adoption.

. This decision is not intended to relieve prospective adoptive parents of their statutory obligation to receive preplacement certification prior to having custody of a child transferred to them from the biological parent. (Matter of Male Infant A., 150 Misc 2d 893 [Fam Ct, NY County 1991], supra.) The difference between the practices which are the subject of the decision in Matter of Male Infant A. and the instant matter is that in those cases, the biological parent does not remain with the child in the preadoptive home.

. 18 NYCRR 421.16 (h) (2).

. Similar reasoning was applied in the dismissal of other second-parent adoption cases. (Matter of Dana, NYLJ, Jan. 26, 1994, at 26, col 3 [Fam Ct, Putnam County] [adoption by lesbian partner of biological mother denied]; *277 Matter of Kimberlee, NYLJ, Dec. 29, 1992, at 27, col 5 [Sur Ct, Richmond County] [adoption denied to unmarried male living with biological mother]; Matter of Hope, 150 Misc 2d 319 [Fam Ct, Westchester County 1991] [adoption denied to unmarried male living with biological mother].)

. In his decision, Surrogate Bloom explained that the determination he reached was not a "reflection of any finding of unfitness on the part of the petitioner” (Matter of Christine, supra, at 30, col 6), but a mandated consequence of the statutory scheme requiring the court to terminate the biological mother’s rights. If the biological mother were suffering from a terminal illness and therefore not desirous of maintaining her parental rights intact, presumably the adoption could have proceeded. Should the adoption be precluded when the biological parent is healthy, has a normal life expectancy and wishes to share the legal responsibility for her child with a second parent?

. The contrary views have premised their denials on the literal interpretation of the State’s adoption statutes which require the parties to be married and which would sever the natural parent’s rights if the adoption were approved. (In re Angel Lace M., 184 Wis 2d 492, 516 NW2d 678 [1994]; In re Adoption Petition of Bruce M., 20 Fam L Rep [BNA] 1307 [DC Super Ct, Fam Div 1994]; In re Adoption of Minor [T.J, 17 Fam L Rep [BNA] 1523 [DC Super Ct, Fam Div 1991].)

. Laws of 1938 (ch 606, § 1), adding Domestic Relations Law § 115, provided "[w]hen a natural or foster parent, having lawful custody of a child, marries or remarries and consents that the stepfather or stepmother may adopt such child, such consent shall not relieve the parent so consenting of any parental duty toward such child.” With the exception of changing "foster parent” to "adoptive parent” and "stepfather and stepmother” to "stepparent,” Domestic Relations Law § 117 (1) (d) contains the same language.

. Household Economic Statistics Div, US Bur of Census, "Housing America’s Children in 1991,” Series H121/93-6 (1991).

. Current Population Reports, US Bur of Census, Marital Status & Living Arrangements, P20-478 (1993).

. US Bur of Census, 1990 Census of Population, CP-2, Social & Economic Characteristics (1993).

. In the 1990’s, the concept of "family” has expanded through kinship foster care to include the formation of parent-child relationships between grandparents who adopt their grandchildren, between aunts and uncles who adopt their nieces and nephews, and between adult siblings who adopt their minor siblings. As a consequence of "open adoption,” many natural parents’ bonds are severed to give the child stability but the emotional ties are preserved through continuing contact.

. The New York County Surrogate was the first court in New York in which a second-parent adoption was approved. Confronted with the changing nature of the "family,” the court dealt with the automatic termination provision of Domestic Relations Law § 117 by terminating the biological mother’s parental rights so the adoption could be finalized for the child’s biological father, with whom the mother did not reside, and then, with its equitable powers conferring back to the consenting biological mother her custodial rights and responsibilities as well as her right to inherit from and through the child. (Matter of A.J.J., 108 Misc 2d 657, 660 [Sur Ct, NY County 1981].)

. Matter of Best, 66 NY2d 151 (1985); Matter of Snowden, 31 NY2d 322 (1972).

. Matter of Malpica-Orsini, 36 NY2d 568 (1975), appeal dismissed sub nom. Orsini v Blasi, 423 US 1042 (1976).

. Matter of Alison D. v Virginia M. (77 NY2d 651, 656 [1991]) poses no barrier to the holding herein. The majority opinion defined "parent” as a "biological [parent]” or "a legal parent by virtue of an adoption.” Because Alison D. was neither, she was found to lack standing to bring a proceeding under Domestic Relations Law § 70 for visitation. Unlike Alison D., the *280 petitioner in the instant matter has commenced this proceeding, with the full support of the biological mother, in order to avoid being treated as a "third party” with inferior rights to the biological parent. Unable to foresee whether possible future litigation will arise between the parties or the biological father, S.M.Y. is attempting to avoid judicial foreclosure because she did not file an adoption petition. (Matter of Thomas S. v Robin Y, 209 AD2d 298.)