OPINION OF THE COURT
John M. Hunt, J.
I
In November of 1987, six-year-old Lisa Steinberg was killed *487 by her “adoptive father,” Joel Steinberg. Steinberg was convicted of manslaughter in the first degree in March of 1989 and he was sentenced to prison for 8V3 to 25 years (see Launders v Steinberg, 9 NY3d 930, 931 [2007]). Following the tragedy of the Steinberg case, the Legislature enacted significant reforms of the adoption statute in 1988 and 1989. The case now before this court involves the failure to comply with the requirements of the adoption statute, which resulted in a transfer of the physical custody of the proposed adoptive child to persons who were not judicially authorized to accept physical custody of the child, in direct contravention of the 1988 and 1989 statutory amendments.
It has been 23 years since the death of Lisa Steinberg, and more than two decades since the Legislature amended the adoption statute to prevent harm to prospective adoptive children. It is both shocking and inconceivable to learn that prospective adoptive parents, biological parents, and attorneys who practice adoption law, disregard the requirements of the adoption statute governing private-placement adoptions in this state.
In this case, the petitioners, Joanna K. and Scottye K., a married couple, have moved for an order dispensing with the necessity of their being certified as qualified adoptive parents in this proposed private-placement adoption matter. For the reasons which follow, the application is denied.
A
This proceeding comes before this court with a convoluted history. The biological mother of the proposed adoptive child is Careese B., who was born on March 13, 1993. Careese and two older siblings are presently the subjects of child protective proceedings which were heard by another judge of the Family Court. As a result of those child protective proceedings, Careese B. has been placed in the legal custody of the Administration for Children’s Services (ACS), and placed in the kinship foster home of her maternal grandmother who has no intention of adopting her three grandchildren. Supervision of the grandmother’s foster home and the three children has been delegated by ACS to Forestdale, Inc., an authorized agency as defined by Social Services Law § 371 (10).
Careese B. was already pregnant at the time that the child protective petitions were filed against her own mother on August 28, 2008. According to information provided to this court by the proposed adoptive parents through their attorney, Ca *488 reese was apparently receiving medical care from the same physician who treats the proposed adoptive parents, and the physician introduced the proposed adoptive parents to Careese. Thereafter they “became acquainted with one another during the [b]iological [mjother’s pregnancy” and they “began to discuss a possible adoption.” The proposed adoptive parents were present for the birth of Careese’s son on March 8, 2009, and the proposed adoptive parents “took the [a]doptive [c]hild to their home after birth upon the [c]onsent of the [bjiological [m]other and upon notice to the Forestdale Agency.”
An affirmation submitted by an attorney from the Legal Aid Society who served as the attorney for Careese and her siblings throughout the child protective proceedings states, in pertinent part, that
“[o]n or about March 16, 2009, Careese B. gave birth to a child named Jeremiah B. On information and belief, based on conversations with Careese B., Careese through the help of her doctor, found a married couple with whom she wanted to place Jeremiah with for adoption. On information and belief based on conversations with the former ACS attorney . . . and ACS supervisor . . . , former Forestdale case worker . . . went out to the [home of proposed adoptive parents] and conducted a preliminary home study.”
On June 8, 2009, the proposed adoptive parents, Joanna K. and Scottye K., filed a petition seeking an order of custody for the proposed adoptive child, Jeremiah B., who had been in their physical custody since his release from the hospital in early March 2009. On September 17, 2009 the proposed adoptive parents, their current attorney, the attorney for Careese and her two siblings in the child protective proceedings, and the newly appointed attorney for Jeremiah B. appeared upon the custody petition before the judge presiding over the child protective proceedings concerning Careese and her two siblings.
On that date, the judge entered a temporary order granting custody of the infant Jeremiah B. to the proposed adoptive parents. The temporary order of custody provides that “based upon the representations made by counsel and the fact that the child has been in the [K.s’] care since birth on the child’s mother’s consent, with the mother’s attorney’s consent, a temporary order of custody is issued.” The case was then adjourned for Forestdale to produce its home study concerning *489 the prospective adoptive parents, so that the court and counsel would have access to that report in deciding whether to grant a final order of custody to the prospective adoptive parents.
On October 1, 2009, the judge was informally advised that Forestdale did not and could not conduct a home study concerning the proposed adoptive parents and the child Jeremiah B. as that child was not in foster care, although his mother is a foster child. The case was then rescheduled until November 20, 2009. On or about October 19, 2009 the attorney for Careese and her siblings filed a motion for the Legal Aid Society to be relieved of its assignment to continue to represent Careese B. In support of the motion to be relieved, counsel stated that
“[a]fter legal research and consultation with legal supervisors, I am asking that the Legal Aid Society be relieved as attorney for Careese B. as respondent-parent in the custody proceedings. It is in Careese’s best interest to have an attorney that can represent her in both the custody/visitation matter and the private adoption proceeding which will . . . involve an open adoption agreement.”
Thereafter, new counsel was appointed for Careese on November 20, 2010 and ACS was directed to conduct an investigation concerning the allegations in the custody petition and to report to the court (Family Ct Act § 1034).
ACS submitted the report of its investigation on December 11, 2009. According to the report, no investigation was made as to Careese B. as she “is in kinship foster care. She is not disputing the custody request of the K. family, and has no plans on taking the child in her care at her current home.” ACS visited the home of Mr. and Mrs. K. and found it well maintained and suitable for an infant. Jeremiah was observed to be doing well and thriving in the care of the petitioners. In addition, it was reported that neither petitioner had any reports on file with the statewide central register of child abuse and maltreatment, nor did they have criminal histories. ACS further reported that Mrs. K. is a full-time homemaker and that the family’s income is “$160,000” per year. The ACS caseworker contacted the pediatrician who cares for Jeremiah, and it was reported that the infant is in good health, and on target to meet expected developmental milestones.
The ACS report indicates that Mr. K. is a producer for a national television network and that Mrs. K. works as a freelance artist for a major corporation. Mr. and Mrs. K. have been *490 together for “about 20 years” and they married approximately 16 years ago. While petitioners tried to have children over the years, they had been unsuccessful. During their recent vacation the petitioners received a telephone call from Mrs. K.’s physician advising her that “there was a young girl in her office who may be giving birth any day. The doctor explained that the young girl is considering giving the child up for adoption.” While the petitioners informed the ACS caseworker that they had not previously considered adopting, “they were anxious to take advantage of the opportunity to be new parents. The Ks immediately returned home, and a meeting was set up in the doctor’s office between [Careese B.] and Joanna K.” Over the next month and prior to Jeremiah’s birth, Mrs. K. developed a relationship with Careese and Careese eventually decided to place her child with Mr. and Mrs. K. after she gave birth. According to ACS, “[tjhere were no adoption agencies involved, no lawyers, and no parental consent given on behalf of Careese.” Mr. and Mrs. K. went to the hospital once the child was born and they took Jeremiah home with them when he was discharged one week after his birth.
The report notes that Mr. and Mrs. K. had been working with Forestdale, the authorized agency caring for Careese, as “it was unclear whether the subject child Jeremiah was also a child of foster care.” While waiting for the child to be born, petitioners became certified as foster parents through Forestdale, although the petitioners were later advised that Jeremiah was never in foster care and there was no impediment to the mother’s placement of Jeremiah with them. Since Jeremiah’s placement with petitioners, there has been a continued relationship between them and Careese. Mrs. K. and Careese speak daily and Careese visits Jeremiah in petitioners’ home on the weekend.
According to the report, the caseworker did speak with Careese B. who stated that “during her later months of pregnancy, the doctor and her therapist asked her if she considered adoption. Careese stated that she then thought about placing the child for adoption. Careese stated that she never contacted an agency, nor lawyers, nor the foster care agency.” Soon thereafter the doctor “mentioned the K. family and their struggles of getting pregnant. Caresse stated that she agreed to meet the family and she instantly connected with Joanna.” Since placing Jeremiah with Mr. and Mrs. K., Careese has remained in contact with petitioners and she visits the child in petitioners’ home every weekend. According to the report, “Careese stated that *491 Joanna gives her money and takes her shopping” and she is sure that Mr. and Mrs. K. will be able to provide her child with a good life. Careese also indicated “that if the K. family ever stopped the relationship with her, she will be devastated.”
On May 24, 2010, Careese B. filed an application to execute a judicial consent to the adoption of her son Jeremiah by petitioners (Domestic Relations Law § 115-b). This petition and the custody petition filed by Mr. and Mrs. K. came before a different Family Court judge on that date. Careese B. appeared with her attorney and the guardian ad litem assigned by the court, Mr. and Mrs. K. appeared with their attorney, the attorney for Jeremiah was present, as was an attorney from ACS. Careese proceeded to execute the judicial consent and it was approved by the judge. In approving the consent, the court incorporated specific conditions agreed to by Careese and Mr. and Mrs. K. relating to postadoption contact between Careese and Jeremiah (Domestic Relations Law § 112-fo). The court also granted a final order of custody of Jeremiah to Mr. and Mrs. K. “pending the adoption.”
II
“In 1987 and 1988, instances came to light where proposed adoptive parents had assumed de facto custody and then abused the children in their charge” (Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 115-d, at 369 [West 2010]; see Matter of Male Infant A., 150 Misc 2d 893, 896 [1991]). In response to this serious problem, the Legislature amended the adoption statute to require that prospective adoptive parents obtain certification that they are qualified to be the adoptive parents of a child from a court of competent jurisdiction prior to their accepting a transfer of the physical custody of a proposed adoptive child (Domestic Relations Law § 115 [1] [b]; § 115-d; Matter of Michael JJ., 200 AD2d 80, 81 [1994]; Matter of Male Infant A., 150 Misc 2d 893, 896 [1991]). Additionally, the Legislature imposed the requirement that adoptive parents promptly obtain an order of temporary guardianship once a prospective adoptive child is placed in their care and custody (Domestic Relations Law § 115-c; Male Infant A. at 896; Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 115-c, at 353-354 [West 2010]).
“The clear intention of these two provisions is that there be a valid certification in place when the adoption petition is filed *492 and that the petition or request for guardianship be filed within 10 days of placement of the child” (Matter of Baby Boy P., 182 Misc 2d 943, 948 [1999]). As observed by Justice Scheinkman,
“[t]he certification process contemplates disclosure of information about the adoptive parents to the court and an investigation into the background of the adoptive parents by a disinterested agency. Under this procedure, the court will have the opportunity to screen out unfit persons before they obtain physical custody of the child and, hopefully, before any harm can befall the child from unfit persons” (Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 115-d, at 369-370 [West 2010] [emphasis added]).
Similarly, the requirement that prospective adoptive parents either file a petition for adoption or an application for temporary guardianship within 10 court days of the placement of a child in their custody ensures that the court is made aware of the presence of the child in the prospective adoptive home, and allows for monitoring of the child and the prospective adoptive parents in the period prior to the issuance of a final order of adoption (see Baby Boy P. at 948; 22 NYCRR 205.57). Moreover, because an order certifying a person as a qualified adoptive parent is valid “for a period not to exceed eighteen months” (Domestic Relations Law § 115-d [6]), persons filing an application for temporary guardianship of a prospective adoptive child must “include an affidavit by the adoptive parent or parents describing any change of circumstances since their certification as a qualified adoptive parent or parents” (Domestic Relations Law § 115-c), thereby alerting the court of any new developments which ought to be considered.
A
On June 9, 2011, over a year after Careese B. executed her judicial consent to the adoption and over a year after custody of Jeremiah was transferred to Mr. and Mrs. K., this application to waive the requirement that petitioners be certified as qualified adoptive parents was filed and referred to this court.
A court may grant a waiver of the requirement that prospective adoptive parents obtain judicial certification as qualified adoptive parents prior to the transfer of the physical custody of a prospective adoptive child to their custody. Indeed, the statute provides that the certification requirement “may be waived *493 upon the court’s own motion or upon the application of any party for good cause shown” (Domestic Relations Law § 115 [1] [b]; see Domestic Relations Law § 115-c [providing for expedited filing of adoption petition or guardianship application where certification requirement waived]). As observed by one court, certification is generally mandatory and “[a] waiver is not to be routinely granted” (Male Infant A. at 897). While
“[a] waiver of the certification requirement would appear to be appropriately granted where, due to exigent circumstances, the adoptive parents could not timely pursue a certification application, or where the certification process was not, through no fault of the adoptive parents, completed prior to the scheduled transfer of physical custody” (Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 115, at 281 [West 2010]).[1]
In this case, the biological mother and prospective adoptive mother were apparently introduced by a physician during the biological mother’s eighth month of pregnancy. The papers before the court indicate that Careese B. and Mrs. K. are both patients of the unnamed physician.[2] Over the next month, Careese B. spent time with Mr. and Mrs. K. and, at some point prior to the birth of the child, Careese decided to place her child with Mr. and Mrs. K. for adoption. There is no indication that Careese B. or petitioners consulted with an attorney or an adoption agency concerning the plan to place the child with petitioners after his birth, although Forestdale, the authorized agency having custody of Careese and her siblings, appears to have had some prehminary involvement until it was determined that Jeremiah was not legally placed with ACS. Thus, Careese B. was legally free to place the child out for adoption (Social Services Law § 374 [2]).
*494 Jeremiah was born on March 8, 2009 and he remained in the hospital for approximately one week following his birth to treat Ms low birth weight. Mr. and Mrs. K. came to the hospital on the day of Jeremiah’s birth and Jeremiah was discharged from the hospital directly to Mr. and Mrs. K. No consent to the adoption of Jeremiah by Mr. and Mrs. K. appears to have been signed by Careese at the time physical custody of the child was delivered to petitioners, and it is clear that petitioners had not been certified as qualified adoptive parents on the date they assumed physical custody of Jeremiah or at any time thereafter.
Subsequently, Jeremiah’s legal status became known to the attorneys and the judge in the context of the child protective proceedings involving Careese and her siblings. Although Jeremiah had been with the petitioners since shortly after his birth on March 8, 2009, no application of any kind had been filed with any court until June 8, 2009 when Mr. and Mrs. K. filed a petition for custody of the cMld. Thus, Jeremiah spent the first three months of Ms life in the physical custody of individuals who have never been certified as qualified adoptive parents by a court of competent jurisdiction. Subsequently, Mr. and Mrs. K. were granted temporary custody of Jeremiah by a judge on September 17, 2009, and on May 24, 2010, another judge accepted Careese B.’s judicial consent to the adoption of Jeremiah by petitioners and granted a final order of custody to Mr. and Mrs. K. “pending the adoption.”
The intent of the 1988 and 1989 amendments of the adoption statute was to proMbit the transfer of the physical custody of an adoptive ciiild to prospective adoptive parents who have not been judicially approved as capable of providing proper care for the child. Here, physical custody of Jeremiah was transferred to individuals who were not then, and are not now, certified as qualified adoptive parents. The statute places the burden of obtaining certification as qualified adoptive parents upon “persons seeking to commence a private-placement adoption” (Domestic Relations Law § 115 [1] [b]), rather than upon the biological parent who seeks to place Ms or her cMld for adoption. That certification is to be obtained “prior to any transfer of physical custody of an adoptive cMld” (id.). Petitioners failed to comply with the statutory prerequisites for accepting custody of a prospective adoptive child, and this court will not waive the certification requirement retroactively under these circumstances.
The certification provisions of the adoption statute are designed to prevent the unregulated and unsanctioned transfer *495 of the physical custody of a prospective adoptive child. Here the adoption statute was not followed, and fortunately no harm came to the child. Nevertheless, this court cannot retroactively approve petitioners’ failure to obtain certification as qualified adoptive parents by waiving compliance with the statute. The waiver provisions are not designed to serve as an end run around the statute CMale Infant A. at 897). Although it is asserted that petitioners had not considered adoption prior to meeting Careese B., they met her and discussed a plan of adoption at least a month prior to the birth of the child. Nothing prevented petitioners from seeking the assistance of counsel who could have filed an expedited application for conditional certification which would have allowed them to accept custody of the child in accordance with the law.
In any event, this court has made no determination concerning the suitability of the petitioners to adopt Jeremiah, or whether that proposed adoption is in the child’s best interests (see Domestic Relations Law § 116 [4]; § 114 [1]; Matter of Donald U., 105 AD2d 875 [1984], lv dismissed 64 NY2d 603 [1984]; Matter of Baby Girl W., 151 AD2d 968 [1989], lv denied 74 NY2d 613 [1989]; Matter of Alicia TT., 294 AD2d 642, 643 [2002]; Matter of Pierre, 12 AD3d 506, 507 [2004]).[3] That determination must await the filing of the adoption petition and all required documentation and reports by the petitioners.
Notwithstanding the failure to comply with the mandates of the adoption statute, Mr. and Mrs. K. have legal and physical custody of Jeremiah pursuant to the order of custody issued on May 24, 2010, and the court has no reason to disturb that arrangement at this time. Given that custody has been granted to the petitioners, they need not make application for an order granting them temporary guardianship of the person of Jeremiah and they may proceed to file their petition to adopt the child.
Accordingly, it is hereby ordered, that the application to waive the provisions of Domestic Relations Law § 115-d relating to certification as qualified adoptive parents is denied in the absence of any showing of good cause and for the reasons stated herein.

. The second circumstance justifying a waiver of the certification requirement, inability to complete the certification process, is now unlikely to occur, as courts have been authorized since 1992 to issue a provisional order of certification where all of the required reports, investigations or inquiries have not been received (Domestic Relations Law § 115-d [6], amended by L 1992, eh 704, eff July 31, 1992).

. Physicians are not permitted to place a child for adoption (Social Services Law § 374 [2]; Matter of Sarosi v Sobol, 155 AD2d 125 [1990]), and any petition for adoption filed by Mr. and Mrs. K. should be accompanied by an affidavit from the physician setting forth his or her involvement in introducing Careese B. and Mrs. K, and any role played by the physician in the mother’s decision to place the child with Mr. and Mrs. K. for adoption.

. The reports submitted to this court do indicate that Jeremiah is receiving excellent care in petitioners’ home and that the child is thriving.